BAKER v GENERAL MOTORS CORPORATION

·COLLIER v GENERAL MOTORS CORPORATION

SEIDELL v GENERAL MOTORS CORPORATION

Docket Nos. 59861-59863. Argued January 10, 1979 (Calendar No. 8).
—Decided October 16, 1980.

A. G. Baker, Jr., Kenneth R. Collier, Robert J. Seidell, and other
members of the United Automobile, Aerospace and Agricul-·
tural Implement Workers of America (UAW) were employed at
General Motors Corporation manufacturing plants. In early
1968 they were laid off because of the effects of local strikes at
certain General Motors foundries not their places of employ-
ment; their claims of unemployment benefits were contested
because they had paid "emergency dues" levied by the UAW
and paid to the union's strike insurance fund in October and
November 1967, during a national strike against the Ford
Motor Company. The Employment Security Appeal Board de-
cided that the plaintiffs were disqualified on the ground that
the payments of the emergency dues amounted to "financing"
the local labor disputes which caused the plaintiffs' unemploy-
ment within the meaning of the Employment Security Act. The
Genesee Circuit Court, Thomas C. Yeotis, J., reversed in *Baker,*
the Wayne Circuit Court, James N. Canham, J., reversed in
*Collier,* and the Ingham Circuit Court, James T. Kallman, J.,
affirmed in *Seidell.* The Court of Appeals, T. M. Burns, P.J., and
M. J. Kelly and D. F. Walsh, JJ., decided that the increased
strike-fund dues paid in 1967 were not "regular" union dues

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 76 Am Jur 2d, Unemployment Compensation § 78 *et seq.*

General principles pertaining to statutory disqualification for unem-
ployment compensation benefits because of strike or labor dis-
pute. 63 ALR3d 88.

[3] 76 Am Jur 2d, Unemployment Compensation §§ 5, 6.

[4-10] 73 Am Jur 2d, Statutes §§ 145, 146, 316.

76 Am Jur 2d, Unemployment Compensation § 85.

What constitutes participation or direct interest in, or financing of,
labor dispute or strike within disqualification provisions of unem-
ployment compensation acts. 62 ALR3d 314.

[11] 73 Am Jur 2d, Statutes § 193.

under the terms of the Employment Security Act and that, therefore, the plaintiffs were disqualified because they had financed the labor dispute which caused their unemployment; and reversed the judgments of the Genesee and Wayne Circuit Courts and affirmed the judgment of the Ingham Circuit Court (Docket Nos. 24083, 24084, 24150). Plaintiffs appeal. *Held:*

1. The plaintiffs argue that a claimant is disqualified only if a labor dispute in active progress is the sole cause of the claimant's unemployment, that their unemployment was due not only to the labor disputes then in progress but also to the seniority provisions of collective bargaining agreements, and to a combination of business decisions made by defendant General Motors Corporation. The dispute need not be the *sole* cause of the unemployment. A claimant is disqualified under the basic disqualification provision of the Employment Security Act if the labor dispute is shown to be a substantial contributing cause of the unemployment. The basic disqualification provision of the statute was intended to apply where the unemployment was caused by a labor dispute and no independent sufficient cause for the unemployment could be shown. In this case the seniority provisions of the collective bargaining agreements and the business decisions made by the defendant would not have caused any unemployment were it not for the labor disputes in progress at functionally integrated foundries. But for those disputes, materials would have been available at the plaintiffs' places of employment, the work force at those places would not have been reduced, and the seniority provisions would not have become operative. The labor disputes at the foundries were shown by competent, material and substantial evidence to have been substantial contributing causes of the layoffs of the plaintiffs. Therefore, the plaintiffs' unemployment was "due to a labor dispute in active progress" under the terms of the statute.

2. The next inquiry is whether the claimants were directly involved in the labor dispute which caused the unemployment. "Financing" the local disputes is a disqualifying direct involvement under the statute, but the statute states that "payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be construed as financing a labor dispute". Considering the remedial purpose of the Employment Security Act to provide relief from the hardship caused by involuntary unemployment, the Court seeks a liberal construction that will effectuate the legislative purpose, yet be consonant with reason and good discretion. The parenthetical language "in amounts and for purposes established prior to the inception of such labor dis-

pute" following the word "regular" in the statute states a separate test which union dues must meet in order to be exempt as a matter of law from classification as financing a labor dispute. In order to be exempt, the dues must be "regular" and in amounts and for purposes established prior to the inception of the labor dispute that caused the claimant's unemployment. Before the statute was amended in 1963 to add the parenthetical language, the word "regular" described a type of union dues the payment of which would not expose a union member to potential disqualification for financing however the dues payments were used. Had the Legislature intended the parenthetical phrase to be a complete definition of "regular", it should have made that intention clear or supplanted the word "regular" altogether. It did not; therefore, the word retains independent significance as a limitation upon the types of union dues automatically exempt from classification as financing.

3. There is no evidence of a legislative intention to equate "regular union dues" with "periodic dues" enforceable through a union security agreement under the National Labor Relations Act. The language about "periodic dues" was inserted into the federal act ten years after the "regular union dues" proviso was added to the Employment Security Act. The Legislature chose the term "regular" to exclude those dues payments required uniformly of union members and collected continually without fluctuations prompted by the exigencies of particular labor disputes. This construction of "regular" is consistent with ordinary usage and the common understanding of the word, and serves to distinguish between sums customarily and continually collected and unusual collections for the purpose of supporting a labor dispute. The October and November, 1967, strike fund dues are not comparable to the strike fund portion of the monthly dues collected before the amendment of the constitution of the union in 1967. By that amendment, each member's strike fund dues were increased from $1.25 per month to $11.25 or $21.25 per month for the duration of the then-existing national collective bargaining dispute in the automotive industry and perhaps until the strike fund contained $25 million. It was not contemplated that the increased amounts would be collected indefinitely; following the emergency, dues would be set at two hours "straight time" pay per month. The emergency dues constituted a marked deviation from the regular pattern of dues collection; they were a temporary emergency measure, with the obvious purpose to replenish the union's strike fund. These payments could not properly be

termed "regular", and therefore it is unnecessary to decide whether they were in amounts and for purposes established before the inception of the labor dispute.

4. The next question is whether payment of the emergency dues constituted "financing" of the local labor disputes. The term "financing" suggests a meaningful connection between the payment or class of payments said to constitute financing and the labor dispute in issue. The appeal board did not give separate consideration to the meaning of "financing", in general or as applied to this case. The matter is remanded to its successor, the Employment Security Board of Review, to reconsider, in the light of its own unique familiarity with the act, the practical considerations, and the related issues implicated by the question, whether the emergency dues payments were sufficiently connected with the local labor disputes which caused the claimants' unemployment to constitute financing of those labor disputes. The parties shall be provided an opportunity to present additional evidence, arguments, and briefs.

5. After this case was argued, the Court granted the plaintiffs permission to file supplemental briefs on two issues said to result from a recent decision of the Supreme Court of the United States. The issues deal with federal pre-emption. The Court is asked, after oral argument, to consider questions, not yet decided by any court, which have heretofore played a secondary role in the case and which lie in an area where the present direction of the Supreme Court of the United States is far from clear. If the claimants did not engage in "financing" as a matter of state law, it may be unnecessary to decide in this case whether federal law pre-empts that provision of the state statute. And even if the plaintiffs are ultimately held to have financed the labor disputes which caused their unemployment, an asserted conflict between state and federal law should not be passed upon until the challenged state provision has been definitively construed. Decision of these issues is therefore deferred until after remand.

Remanded to the Employment Security Board of Review for further proceedings. Jurisdiction retained.

74 Mich App 237; 254 NW2d 45 (1977) reversed and remanded for further proceedings.

1. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING LABOR DISPUTE.

A labor dispute must be a substantial contributing cause, but it need not be the sole cause, of unemployment, to disqualify a

worker under the basic labor dispute disqualification provision of the Employment Security Act; the Legislature intended the basic disqualification provision to apply where the claimant's unemployment was caused by a labor dispute and no independent and sufficient cause for the unemployment could be shown (MCL 421.29[8]; MSA 17.531[8]).

2. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING LABOR DISPUTE.

Unemployment was "due to a labor dispute in active progress" under the terms of the Employment Security Act where local labor disputes at certain foundries owned by an employer were shown by competent, material and substantial evidence to have been substantial contributing causes of the layoffs of plaintiffs at other manufacturing plants of the employer; the seniority provisions of the parties' collective bargaining agreement and business decisions made by the employer were not an independent and sufficient cause of the unemployment where, but for the local disputes at the employer's foundries, materials would have been available at the manufacturing plants where the plaintiffs worked, the work force at those places would not have been reduced, and the seniority provisions would not have become operative (MCL 421.29[8]; MSA 17.531[8]).

3. UNEMPLOYMENT COMPENSATION — STATUTES — CONSTRUCTION.

The remedial purpose of the Employment Security Act to provide relief from the hardship caused by involuntary unemployment requires a liberal construction of the act that will effectuate that legislative purpose, yet be consonant with reason and good discretion (MCL 421.1 et seq.; MSA 17.501 et seq.).

4. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING LABOR DISPUTE — UNION DUES.

Union dues, in order to be exempt from the provision of the Employment Security Act concerning disqualification of claimants for financing a labor dispute, must be both regular and in amounts and for purposes established prior to the inception of the labor dispute that caused the claimant's unemployment; the parenthetical language "in amounts and for purposes established prior to the inception of such labor dispute", added by amendment, states a separate test that "regular" union dues must meet in order to be exempt as a matter of law from possible classification as financing a labor dispute (MCL 421.29[8]; MSA 17.531[8]).

5. Unemployment Compensation — Disqualification — Financing Labor Dispute — Union Dues.

The term "regular" union dues in the Employment Security Act describes a type of union dues, the payment of which would not expose a union member to potential disqualification for financing however the dues payments were used; the word retains independent significance as a limitation upon the union dues exempt as a matter of law from potential classification as financing because, had the Legislature intended the later addition to the statute of a parenthetical phrase to be a complete definition of "regular", it should have made that intention clear or supplanted the word "regular" altogether (MCL 421.29[8]; MSA 17.531[8]).

6. Unemployment Compensation — Disqualification — Financing Labor Dispute — "Regular" Union Dues.

There is no evidence of a legislative intention to equate "regular union dues" in the Employment Security Act with the "periodic dues" enforceable through a security agreement under the National Labor Relations Act where the federal act's reference to "periodic dues" was not inserted until ten years after the "regular union dues" proviso was added to the Employment Security Act (29 USC 158[a][3]; MCL 431.29[8]; MSA 17.531[8]).

7. Unemployment Compensation — Disqualification — Financing Labor Dispute — "Regular" Union Dues — Words and Phrases.

The Legislature chose the term "regular" union dues in the Employment Security Act to exclude from possible treatment as "financing" a labor dispute those dues payments required uniformly of union members and collected continually without fluctuations prompted by the exigencies of particular labor disputes; such a construction of the term is consistent with ordinary usage and the common understanding of the word, and serves to distinguish between sums customarily and continually collected, and unusual collections for the purpose of financing a labor dispute (MCL 421.29[8]; MSA 17.531[8]).

8. Unemployment Compensation — Disqualification — Financing Labor Dispute — "Regular" Union Dues.

Payments by union members of temporary "emergency dues" into a union strike fund were not "regular" union dues under the terms of the Employment Security Act where each member's regular strike-fund dues were increased from $1.25 per month to $11.25 or $21.25 per month for the duration of a national

impasse in the union's collective bargaining and perhaps until the strike fund contained $25 million and after the impasse dues would be set at a lower amount, the emergency dues constituted a marked deviation from the regular pattern of dues collection, and they were a temporary emergency measure whose obvious purpose was to replenish the union's strike fund (MCL 421.29[8]; MSA 17.531[8]).

9. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING LABOR DISPUTE — "FINANCING".

The term "financing" used in the provision of the Employment Security Act disqualifying claimants for financing a labor dispute suggests a meaningful connection between the payment or class of payments said to constitute financing and the labor dispute (MCL 421.29[8]; MSA 17.531[8]).

10. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING LABOR DISPUTE — "FINANCING".

A case is remanded to the Employment Security Board of Review to reconsider, in the light of its own unique familiarity with the Employment Security Act, the practical considerations, and the related issues implicated, whether claimants' emergency dues payments into a strike fund were sufficiently connected with the local labor disputes which caused their unemployment to constitute "financing" of those labor disputes and thus disqualify the claimants for unemployment benefits under the act, where the board's predecessor, in deciding the case, did not give separate consideration to the meaning of "financing" in general or as applied to the case (MCL 421.29[8]; MSA 17.531[8]).

11. STATUTES — CONSTRUCTION — CONFLICTS.

An asserted conflict between state and federal law should not be decided until the challenged state provision has been definitively construed.

*John A. Fillion, Jordan Rossen, M. Jay Whitman, Leonard Page; Marston, Sachs, Nunn, Kates, Kadushin & O'Hare,* P.C. (by *Charles Looman);* and *Altshuler & Berzon* (by *Fred H. Altshuler, Stephen P. Berzon* and *Evelyn R. Frank)* for plaintiffs.

*Otis M. Smith,* General Counsel, *J. R. Wheatley, E. L. Hartwig, E. J. Dilworth, W. B. Rogers, W. R.*

*Tucker, M. J. Connolly,* and *M. Alice McCann* for defendant General Motors Corporation.

Amicus Curiae:

*Rudolph L. Milasich, Jr., Carl B. Frankel,* and *Kasoff, Young, Gottesman, Kovinsky & Walkon (Bernard Kleiman,* of counsel) for United Steelworkers of America.

LEVIN, J. The issue in this case is whether the payment by union members of temporarily increased "emergency dues", authorized by an amendment to the union constitution, required as a condition of union membership and collected in designated amounts as part of the members' monthly dues, into a union strike fund during an ongoing national strike against another employer, disqualifies those members from receiving unemployment compensation benefits when they subsequently become unemployed because local issue strikes in other establishments operated by their employer result in layoffs at the members' own establishments, and when the local issue strikers at the other establishments receive strike benefits from the fund into which the "emergency dues" were paid.

Plaintiffs are members of a national union representing workers in the automobile industry and were employed at General Motors plants in Michigan in early 1968. When plaintiffs were laid off in the wake of local strikes at other GM plants, their eligibility for unemployment benefits was contested because of certain dues payments they had made to their union strike fund several months before, in the midst of a national strike against Ford Motor Company.

This controversy arises under the labor dispute disqualification provision of the Michigan Employ-

ment Security Act,[1] subsection 29(8),[2] which, at the time, provided in pertinent part:

"(8) An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by such labor dispute, in the establishment in which he is or was last employed, or to a labor dispute (other than a lockout) in active progress, or to shutdown or start-up operations caused by such labor dispute, in any other establishment within the United States which is functionally integrated with such establishment and is operated by the same employing unit. No individual shall be disqualified under this subsection 29(8) if he is not directly involved in such dispute.

"(a) For the purposes of this subsection 29(8), no individual shall be deemed to be directly involved in a labor dispute unless it is established that:

* * *

"II. He is participating in or financing or directly interested in the labor dispute which causes his total or partial unemployment. The payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be construed as financing a labor dispute within the meaning of this subparagraph * * *." 1967 PA 254.[3]

---

[1] MCL 421.1 *et seq.;* MSA 17.501 *et seq.*

[2] MCL 421.29(8); MSA 17.531(8).

[3] 1974 PA 104 added a new sentence and, along with 1975 PA 110, made minor changes in wording and punctuation of this subsection. The quoted portion of the statute now reads:

"An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by that labor dispute, in the establishment in which he is or was last employed, or to a labor dispute, other than a lockout, in active progress, or to shutdown or start-up operations caused by that labor dispute, in any other establishment within the United States which is functionally integrated with the establishment and is operated by the same employing unit. An individual's disqualification imposed or imposable under this subsection shall be terminated by his performing services in employment with an employer in at least 2 consecutive weeks falling wholly within the period of his total or

The application of subsection 29(8) to the facts of this case potentially raises three connected questions:

(1) Was plaintiffs' unemployment "due to" labor disputes in active progress at other establishments operated within the United States by the same employing unit and functionally integrated with the establishments where plaintiffs were employed?

(2) If so, were plaintiffs' emergency dues payments to the strike fund sufficiently connected with the labor disputes which caused their unemployment to constitute "financing" of those labor disputes unless excepted by the terms of subparagraph 29(8)(a)(II)?

(3) If so, are plaintiffs' temporary emergency dues payments excepted from the category of "financing" because they were "regular union dues (in amounts and for purposes established prior to the inception of such labor dispute)"?

We conclude that plaintiffs' unemployment was due to labor disputes in active progress at functionally integrated domestic GM plants. The basic disqualification provision of subsection 29(8) disqualifies an individual whose unemployment is

---

partial unemployment due to the labor dispute, and in addition by earning wages in each of those weeks in an amount equal to or in excess of his actual or potential weekly benefit rate with respect to those weeks based on his employment with the employer involved in the labor dispute. An individual shall not be disqualified under this subsection if he is not directly involved in the dispute.

"(a) For the purposes of this subsection an individual shall not be deemed to be directly involved in a labor dispute unless it is established that:

*   *   *

"(ii) He is participating in or financing or directly interested in the labor dispute which causes his total or partial unemployment. The payment of regular union dues, in amounts and for purposes established before the inception of the labor dispute, shall not be construed as financing a labor dispute within the meaning of this subparagraph *   *   *." MCL 421.29(8); MSA 17.531(8).

claimed to result from a labor dispute if that labor dispute is shown to be a substantial contributing cause of his or her unemployment. While the Legislature did not intend to withhold benefits from individuals who would have been unemployed even if an apparently related labor dispute had not occurred, the dispute need not be the sole cause of the unemployment.

Before considering whether the emergency dues payments may be regarded as having financed the labor disputes that caused plaintiffs' unemployment, we seek to determine whether those payments are specifically exempted from treatment as financing by the second sentence of subparagraph 29(8)(a)(II). We agree with the Court of Appeals that that provision requires union dues to satisfy two conditions in order to be exempted as a matter of law from possible classification as financing a labor dispute: the dues must be (1) regular and (2) in amounts and for purposes established prior to the inception of the labor dispute that caused the claimant's unemployment.

We further agree with the Court of Appeals that the temporary emergency dues paid by UAW members in October and November, 1967 were not "regular" but extraordinary. The Legislature chose the term "regular" to exclude from possible treatment as financing those dues payments required uniformly of union members and collected on a continuing basis without fluctuations prompted by the exigencies of a particular labor dispute or disputes. The payments in question, enacted as a temporary emergency measure to build the union strike fund in the midst of a national strike against Ford Motor Company, cannot properly be described as "regular". We therefore need not decide whether the emergency dues were estab-

lished "prior to the inception of [the] labor dispute".

The referee, the appeal board and the Court of Appeals all implicitly assumed that unless the emergency dues payments fell within the specific exemption for "regular union dues (in amounts and for purposes established prior to the inception of such labor dispute)" the payments would constitute financing because the union strike fund had paid strike benefits to workers involved in the labor disputes that caused plaintiffs' unemployment.

The determination that the emergency dues payments are not exempted from treatment as financing by the second sentence of subparagraph 29(8)(a)(II) does not, however, require the conclusion that plaintiffs financed the local labor disputes which caused their unemployment.

Since the appeal board, the tribunal with the most experience and expertise in the application of the act, did not discuss the meaning of "financing", we remand this matter to the board's successor for further explication of the term "financing".

In supplemental briefs filed after oral argument, the parties have addressed the question whether federal labor policy prohibits a state from disqualifying union members for unemployment compensation benefits because they have made required payments into a union's general strike fund. We do not decide whether the federal labor law preempts the application of the "financing" disqualification of the Employment Security Act because the construction given the term "financing" after remand may make it unnecessary to address the federal preemption issues.

We retain jurisdiction.

I

Every three years the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and the three major automakers (General Motors, Ford and Chrysler) negotiate new national collective bargaining agreements. The case has its roots in events contemporaneous with and subsequent to the 1967 automobile industry contract negotiations.

In June, 1967, the UAW notified each of the three major automakers by letter of its intent to terminate all national and local collective bargaining agreements when they expired on September 6, 1967. GM and the UAW began negotiations toward a new national agreement on July 15, 1967.

In a vote taken during the latter part of August, the UAW's GM membership authorized strikes, if necessary, on national and local issues. However, the expiration of the agreements did not immediately result in strikes at GM plants because Ford, not GM, was selected as the strike target for that year.

On October 8, 1967, while a nationwide UAW strike against Ford was in progress, a special UAW convention amended article 16 of the union's constitution to provide for "emergency dues".[4] The new dues, effective immediately and continuing "during the current collective bargain-

---

[4] The text of the amendments reads, in pertinent part:
"Article 16
"Section 2(a).
"Emergency Dues
"All dues are payable during the current month to the Financial Secretary of the Local Union.
"Commencing with the eighth (8th) day of October 1967 until October 31, 1967, and for each month thereafter *during the emer-*

ing emergency as determined by the International Executive Board and thereafter, if necessary, until the International Union Strike Insurance Fund has reached the sum of Twenty-Five Million Dollars ($25,000,000)", increased each member's monthly contribution to the union Strike Insurance Fund from $1.25 to $11.25 or $21.25, depending upon the average hourly wage at the member's plant. After the emergency ended or the $25,000,000 goal was reached, each member's monthly dues would consist of two hours' "straight time" pay, with 40% earmarked for the member's local union and 30% each allocated to the International Union's Administrative and Strike Funds.

UAW members employed at GM plants in Michigan, including each of the plaintiffs, paid the emergency dues in October and November, 1967.

gency as defined in the last paragraph of this Subsection, Union administrative dues shall be three dollars and seventy-five cents ($3.75) per month and Union Strike Insurance Fund dues shall be as follows:

"1. For those working in plants where the average straight time earnings * * * is three dollars ($3.00) or more, twenty-one dollars and twenty-five cents ($21.25) per month.

"2. For those working in plants where the average straight time earnings * * * is less than three dollars ($3.00), eleven dollars and twenty-five cents ($11.25).

\* \* \*

"This schedule of dues shall remain in effect *during the current collective bargaining emergency as determined by the International Executive Board and thereafter, if necessary, until the International Union Strike Insurance Fund has reached the sum of twenty-five million dollars ($25,000,000), at which time the dues structure established in 2(b), below, shall become effective.*" (Emphasis supplied.)

Section 2(b) provided in part:

"All dues are payable during the current month to the Financial Secretary of the Local Union. *Commencing with the month following the emergency as set out in Section 2(a) and for each month thereafter, minimum Union dues shall be a sum equivalent to two hours straight time pay per month* * * *.

"Dues income shall be distributed so that the Local Union shall receive forty (40) per cent, the International Union Strike Insurance Fund shall receive thirty (30) per cent and the General Administrative Fund of the International Union shall receive thirty (30) per cent." (Emphasis supplied.)

On November 30, 1967, the UAW determined that there would be no nationwide strike at GM plants during December, 1967 and waived collection of the emergency dues during December, 1967 and January, 1968. However, the letter informing GM of the waiver noted that "the collective bargaining emergency is not yet ended".[5]

The UAW and GM reached agreement on all national issues by December 15, 1967. Following ratification by the membership, the new national agreement took effect on January 1, 1968. However, local bargaining issues at a number of plants remained unresolved.

During January, 1968, GM foundries at Saginaw, Michigan; Defiance, Ohio; and Tonawanda, New York, were each shut down for approximately 10 days because of strikes called by the UAW over local issues. It is stipulated that the striking UAW members at these establishments received strike benefits from the strike fund in which the emergency dues collected in October and November were deposited. The local strikes at the foundries were followed by shutdowns or cutbacks in production at 24 other GM plants in Michigan and over 19,000 workers, including the plaintiffs, were laid off from their employment in the affected plants.

The Michigan Employment Security Commission

---

[5] The letter stated in part:

"We would like to advise you that the International Executive Board, at a meeting held November 30, 1967, determined that there would not be a strike at General Motors Corporation plants in the United States and Canada *at least during the month of December, 1967,* that the collective bargaining emergency could be determined to be *in suspension* and, therefore, the emergency dues would be waived for the month of December, 1967, and the month of January, 1968.

"*Since, obviously, the collective bargaining emergency is not yet ended, the dues program is* reverting to the basic five dollars ($5.00) per month in effect prior to the October 8, 1967, Convention, and *not going to the permanent dues program* of two hours' pay per month." (Emphasis supplied.)

approved plaintiffs' applications for unemployment compensation benefits. GM appealed to a hearing referee who reversed the Commission's decision and ruled that plaintiffs were disqualified under subsection 29(8) of the Michigan Employment Security Act because they had financed the labor disputes which caused their unemployment.[6] The referee found that plaintiffs' increased contributions to the union's strike fund during October and November, 1967 were not "regular union dues" within the meaning of the subparagraph 29(8)(a)(II) exception because they were not "in amounts and for purposes established prior to the inception of such labor dispute". The referee's opinion did not discuss what activities were intended to fall under the heading of "financing" but, rather, implicitly assumed that the dues in question were financing unless expressly excepted by the statute.

The Michigan Employment Security Appeal Board agreed with the referee that the emergency dues could not properly be described as "regular union dues". Like the referee, the appeal board treated the parenthetical language—"(in amounts and for purposes established prior to the inception of such labor dispute)"—as an explanation of the word "regular". The board focused upon the meaning of that language and the associated question when "such labor dispute" has its inception, and, rather than explicating the concept of "financing",

[6] The referee who heard the consolidated appeals on plaintiffs' claims took testimony in regard to the circumstances surrounding the layoffs at each plant and rendered separate decisions on the claims filed by the employees of each plant. Some layoffs could not be traced to the labor disputes at the foundries but, instead, were attributed to other local strikes in which the strikers' receipt of benefits from the strike fund was not shown by the record. The referee found that no disqualification applied in these instances and General Motors did not appeal from those adverse rulings.

assumed that the emergency dues payments disqualified plaintiffs unless the stated exception applied. Declaring that the inception of the labor dispute had preceded the adoption of the increased strike fund dues, the board upheld the referee's decision disqualifying plaintiffs.

On appeal to circuit court, the board's decision was affirmed by the Ingham Circuit Court and reversed by the Genesee and Wayne Circuit Courts.

The Court of Appeals, construing the subparagraph 29(8)(a)(II) exclusion of "regular union dues" from the definition of financing as evidence of a legislative intent to treat non-regular or extraordinary union dues as financing a labor dispute if used to support a strike, held that the increased strike fund dues paid during October and November, 1967 were not "regular" as that term is ordinarily understood. Finding that the referee and the appeal board had correctly determined that claimants were disqualified for financing the labor dispute which caused their unemployment, the Court of Appeals affirmed the Ingham Circuit Court and reversed the Genesee and Wayne Circuit Courts. Having concluded that the emergency dues were extraordinary rather than regular, the Court of Appeals found it unnecessary to explore the parenthetical language or to decide when the labor dispute causing plaintiffs' unemployment had its inception.[7]

We granted leave to appeal, limited to the following issues:

"(1) Did payment of the dues in question constitute financing of the labor dispute as a matter of law;

---

[7] *Baker v General Motors Corp,* 74 Mich App 237; 254 NW2d 45 (1977).

"(2) Was plaintiffs' unemployment caused by a labor dispute in active progress?" 402 Mich 828 (1977).

## II

Every state's unemployment compensation statute includes some provision disqualifying from benefits an individual whose unemployment results from a labor dispute.[8] Most provisions are patterned after the corresponding section of the draft bills published by the Social Security Board[9] following passage of the Social Security Act of 1935,[10] which provided federal funding for state unemployment insurance programs.[11] The concept of labor dispute disqualification and the various statutes embodying it have engendered substantial litigation[12] and commentary.[13]

The Michigan statute declares the basic condition of labor dispute disqualification in its introductory sentence:

---

[8] Anno: *General Principles Pertaining to Statutory Disqualification for Unemployment Compensation Benefits Because of Strike or Labor Dispute,* 63 ALR3d 88, 96; Lewis, *The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence,* 45 J Urban L 319, 320 (1967).

[9] Lewis, fn 8 *supra,* p 322, fn 14, cites Social Security Board, Draft Bills for State Unemployment Compensation of Pooled Fund and Employer Reserve Account Types (1936).

[10] 49 Stat 620; 42 USC 301 *et seq.*

[11] Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U Chi L Rev 294 (1950); Lewis, fn 8 *supra,* pp 320-322.

[12] See, generally, Anno, fn 8 *supra.*

[13] In addition to the articles by Lewis (see fn 8, *supra)* and Shadur (see fn 11, *supra),* see Fierst & Spector, *Unemployment Compensation in Labor Disputes,* 49 Yale L J 461 (1940); Lesser, *Labor Disputes and Unemployment Compensation,* 55 Yale L J 167 (1945); Williams, *The Labor Dispute Disqualification—A Primer and Some Problems,* 8 Vand L Rev 338 (1955); Note, *Eligibility for Unemployment Benefits of Persons Involuntarily Unemployed Because of Labor Disputes,* 49 Colum L Rev 550 (1949).

"An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by such labor dispute, in the establishment in which he is or was last employed, or to a labor dispute (other than a lockout) in active progress, or to shutdown or start-up operations caused by such labor dispute, in any other establishment within the United States which is functionally integrated with such establishment and is operated by the same employing unit."[14]

But under our statute, as under most statutes, determining whether a claimant's unemployment falls within the terms of the basic disqualification is the beginning, not the end, of the inquiry.[15] The seemingly categorical disqualification principle of the first sentence is tempered by the language that follows it:

"No individual shall be disqualified under this subsection 29(8) if he is not directly involved in such dispute."

The statute requires that "direct involvement" be shown by establishing one of four enumerated circumstances. This case concerns but one aspect of the second of the listed alternatives:

"II. He is participating in or *financing* or directly interested in *the labor dispute which causes his total or partial unemployment.* The payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be con-

---

[14] 1967 PA 254.

[15] Shadur, *supra,* pp 324-325; Note, fn 13 *supra,* p 558.

strued as financing a labor dispute within the meaning of this subparagraph * * *."[16] (Emphasis supplied.)

## III

Because the basic disqualification provision of subsection 29(8) applies only if the claimant's unemployment is "due to a labor dispute in active progress" in the establishment where he is or was last employed, or in a functionally integrated establishment operated within the United States by the same employing unit, the threshold consideration is whether the facts of this case evidence the requisite causal link between plaintiffs' unemployment and a dispute in active progress.[17] Absent that causal connection, plaintiffs are not disqualified.

The Court of Appeals regarded the appeal board's finding that plaintiffs' unemployment was due to a labor dispute in active progress at a

[16] In addition to the activities listed in subparagraph 29(8)(a)(II), the following conduct establishes direct involvement under paragraph 29(8)(a):

"1. At the *time or in the course of a labor dispute in the establish-*ment in which he was then employed, he shall *in concert with 1 or more other employees have voluntarily stopped working* other than at the direction of his employing unit, or

* * *

"III. At any time, there being no labor dispute in the establishment or department in which he was employed, he shall have *voluntarily stopped working,* other than at the direction of his employing unit, *in sympathy with employees in some other establishment or department* in which a labor dispute was then in progress, or

"IV. His total or partial unemployment is due to a labor dispute which was or is in progress in any department or unit or group of workers *in the same establishment."* 1967 PA 254 (emphasis supplied).

[17] "[T]he basic disqualification finding required in the first sentence * * * must be legally made before the proviso relating to 'direct involvement' becomes effective, and before considering or applying the tests of direct involvement * * *." *Park v Employment Security Comm,* 355 Mich 103, 131; 94 NW2d 407 (1959).

functionally integrated plant as conclusive because supported by competent, material and substantial evidence on the whole record.[18] We agree with the Court of Appeals assessment of the evidence but find its conclusion only partially responsive to plaintiffs' arguments. We understand plaintiffs to assert not only that the appeal board erred in finding a causal connection in fact, but also that the board and all courts except the Wayne Circuit Court[19] misunderstood the legal standard of causation required by this subsection.

Plaintiffs argue that a claimant may be disqualified under subsection 29(8) only if a labor dispute in active progress is the sole cause of the claimant's unemployment. They assert that their unemployment was due not only to the labor disputes in progress at the functionally integrated foundries and plants, but also to the seniority provisions of the national and local agreements, which marked them as the first to be laid off, and to a combination of GM business decisions, particularly the choice not to replace materials supplied by the struck establishments through purchases in the open market. Plaintiffs urge us to conclude that the causal connection required to support the

---

[18] *Baker v General Motors Corp, supra,* 74 Mich App 245, fn 3.
See Const 1963, art 6, § 28; MCL 421.38(1); MSA 17.540(1).

[19] The opinion of the Wayne Circuit Court stated in part:

"Another factor in the layoffs were *[sic]* the economic situations GM chose to become involved with in the various plants. Much of the business at the Wayne County Plants was dependent upon parts supplied from other, then struck, plants. GM could have purchased the necessary parts on the open market, but chose not to do so.

"In order to uphold the finding from below, it must appear that the strike alone was the reason for the claimants' unemployment and such was not the case. It is the opinion of this court that the claimants herein are entitled to unemployment compensation for the two periods during which they were unemployed in early 1968."

Although plaintiffs advanced the identical argument in the other circuit courts, in the Court of Appeals, and before the appeal board, none of those tribunals specifically addressed it.

threshold finding of disqualification has therefore not been established.

We disagree. An individual is disqualified for benefits under the basic provision if a disqualifying labor dispute is shown to be a substantial contributing cause of his or her unemployment. The dispute need not be the sole cause of the unemployment.

The decisions of this Court relied on by the plaintiffs establish only that disqualification is inappropriate where other circumstances unrelated to the labor dispute would themselves have been sufficient to cause the unemployment for which benefits are claimed.[20] The Legislature did

[20] In *Abbott v Unemployment Compensation Comm,* 323 Mich 32, 47; 34 NW2d 542 (1948), the claimants were temporarily laid off during reconversion of the plant where they were employed from wartime to peacetime production. A strike halted reconversion operations on September 8, 1945. The appeal board found as a fact that "the employer's reconversion program had progressed to the point that as of September 29, 1945, all of the employees involved herein would have been recalled to work *were it not for the strike then in existence".* (Emphasis supplied.) This Court upheld the board's determination that the labor dispute disqualification barred claimants from receiving unemployment benefits from September 29, 1945 through the date the strike was settled.

In *Clapp v Unemployment Compensation Comm,* 325 Mich 212; 38 NW2d 325 (1949), the claimants were laid off on November 14, 1945 when General Motors shut down its main Buick production line and an associated Fisher Body plant because it was unable to obtain frames from its supplier. On November 21, 1945, before the shortage of frames was remedied, the UAW called a strike at all GM plants; the strike lasted until March 13, 1946. The supplier resumed production of Buick frames in December. GM claimed that it would have recommenced Buick production on December 18, 1945 were it not for the then existing labor dispute and that the claimants were disqualified from and after that date. Payment of benefits for the period during which production was precluded by the frame shortage was not questioned, and this Court did not pass upon the issue. *Id.,* p 219. In affirming the appeal board's determination that the labor dispute disqualification applied from December 18, 1945 onward, the Court noted that there was sufficient evidence "to warrant the finding that all the plaintiffs would have been called back upon resumption of activities on December 18, 1945, *had there been no strike". Id.,* p 226 (emphasis supplied).

In *Scott v Budd Co,* 380 Mich 29, 37; 155 NW2d 161 (1968), 44 of

not intend to withhold benefits from individuals who would have been unemployed even if an apparently related labor dispute had not occurred. Those decisions all support the conclusion that the Legislature intended the basic disqualification provision to apply when a claimant's unemployment was caused by a labor dispute and no independent and sufficient cause for the unemployment could be shown.[21]

The seniority provisions and management decisions which plaintiffs identify as contributing causes of their unemployment would not them-

the 45 claimants were laid off when the employer reduced operations in its hub and drum machining section because a walkout in the foundry section of the same establishment had reduced the supply of brake drums available for machining; those employees fell within the labor dispute disqualification. One claimant employed in a different section was held not disqualified:

"His unquestioned testimony is that he was bumped by someone exercising greater seniority rights, but there is nothing to link the bumping with an employee who exercised such right to bump due to the shutdown operations in the brake drum section. No causal connection between a labor dispute in active progress or between the shutdown or start-up operations caused by such labor dispute, as to claimant Knapp, was established."

The opinion thus intimates that if Knapp's displacement by a fellow employee with greater seniority rights had been occasioned by the dispute-caused shutdown that idled the other claimants, Knapp would also have been disqualified.

To the same effect, see *Unemployment Compensation Comm of Alaska v Aragon,* 329 US 143, 151-152; 67 S Ct 245; 91 L Ed 136 (1946), where the United States Supreme Court concluded that the employees of two salmon canneries that failed to operate during the 1940 season "only because of their inability to negotiate satisfactory labor agreements" were properly disqualified, but that the employees of another canner whose cancellation of its season "was caused primarily by factors other than the company's inability to negotiate a satisfactory labor contract" were not disqualified.

[21] *Abbott* and *Clapp* arose under an earlier version of the basic disqualification provision, which disqualified a claimant if his unemployment resulted from "a stoppage of work existing because of a labor dispute in the establishment in which he is or was last employed". Although this Court's decisions "construing prior language are not applicable except insofar as they may afford guidance", *Scott v Budd Co, supra,* p 36, *Scott* appears to have approached the causation question in the same manner as *Abbott* and *Clapp.*

selves have caused plaintiffs' unemployment or any unemployment were it not for the labor disputes in active progress at the functionally integrated foundries. But for those disputes, materials would have been available at plaintiffs' places of employment, the work force at those establishments would not have been reduced, and the seniority provisions would not have become operative. The labor disputes in active progress at the foundries were shown by competent, material and substantial evidence to have been substantial contributing causes of the layoffs which idled plaintiffs. We affirm the board's finding that plaintiffs' unemployment was "due to a labor dispute in active progress" within the meaning of subsection 29(8).

## IV

Once it has been determined that the basic disqualification provision applies, the inquiry progresses to whether the claimant is directly involved in the labor dispute which caused his or her unemployment. In this case, plaintiffs' emergency dues payments to the strike fund are alleged to constitute "financing" of the local disputes at the foundries—a disqualifying direct involvement under subparagraph 29(8)(a)(II). That subparagraph, however, also declares that certain kinds of union dues payments may not be construed as "financing a labor dispute". Since plaintiffs would escape disqualification if their emergency dues payments fall within the protective provision, we consider whether those payments are specifically exempted from treatment as "financing" before attempting to determine whether they may be affirmatively classified under that heading.

Subparagraph 29(8)(a)(II) states that the "payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be construed as financing a labor dispute * * *". Except for the parenthetical language, which was added in 1963,[22] this proviso has been part of Michigan's unemployment compensation act since 1937.[23]

The referee and the appeal board both treated the parenthetical language as a limitation that would preclude labeling certain payments "regular" union dues and concluded that the payments in question did not satisfy the parenthetical condition. The Court of Appeals reasoned that the express exclusion of "regular union dues" from the category of "financing" evidenced a legislative intent to leave every other type of union assessment used to support a labor dispute within the terms of the subsection 29(8) disqualification, and that the language added in 1963 only qualified the "regular union dues" exception further. Employing the word "regular" as the first branch of a two-pronged test completed by the parenthetical language, the Court of Appeals declared that " 'regular' is synonymous with 'normal', 'typical' and 'natural' to the extent that they all mean 'being of the sort or kind that is expected as usual, ordinary or average' ", and concluded that the increased dues paid pursuant to the October, 1967 constitutional amendment did not meet that description.

Plaintiffs attack the Court of Appeals reliance upon everyday meanings of the word "regular" and urge us to construe the term "regular union dues" as the equivalent of "periodic dues" under

[22] 1963 PA 226.
[23] 1937 PA 347.

§ 8(a)(3) of the National Labor Relations Act,[24] a term which they assert means "those uniformly levied union dues which are enforceable through a union security clause and which may be required of union members as a condition of continued employment".[25] In plaintiffs' view, it is immaterial whether the amount of the dues is temporary or permanent, fixed or variable, so long as they are part of the union's constitutionally adopted dues structure rather than separately imposed special assessments. Plaintiffs contend, alternatively, that the Legislature intended the parenthetical language added in 1963 to explain the meaning of "regular union dues".

The parties direct us to no legislative history which would aid us in reaching a more precise understanding of the meaning of "regular union dues" or the relationship between that phrase and the parenthetical language added in 1963. Mindful of the remedial purpose of the Michigan Employment Security Act to provide relief from the hardship caused by involuntary unemployment,[26] we seek a liberal construction that will effectuate that legislative purpose,[27] yet be consonant with reason and good discretion.[28]

[24] 29 USC 158(a)(3).

[25] Appellants' brief, p 16.

Only the collection of "the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership", as opposed to fines, special assessments or other penalties, may be enforced through a union security clause under § 8(a)(3). See *National Labor Relations Board v Spector Freight System, Inc,* 273 F2d 272, 275-276 (CA 8, 1960), *cert den* 362 US 962; 80 S Ct 879; 4 L Ed 2d 877 (1960). The emergency dues which gave rise to this case were ruled to be "a permissible change in 'periodic dues' within the meaning of the Section 8(a)(3) proviso" by the NLRB Regional Director for Region 31 and the NLRB General Counsel.

[26] MCL 421.2; MSA 17.502.

[27] *Noblit v The Marmon Group,* 386 Mich 652, 654; 194 NW2d 324 (1972).

[28] *Collins v Secretary of State,* 384 Mich 656, 666; 187 NW2d 423 (1971).

We conclude, as did the Court of Appeals, that the parenthetical language states a separate test that union dues must meet in order to be exempted as a matter of law from possible classification as financing a labor dispute. In order to be exempt under all circumstances, union dues must be both (1) regular and (2) in amounts and for purposes established prior to the inception of the labor dispute that caused the claimant's unemployment. We further agree with the Court of Appeals that the temporary emergency dues paid in October and November, 1967 were not "regular" union dues.

Every word of a statute should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible.[29] Before the 1963 amendment, the word "regular" described a type of union dues, payment of which would not expose a union member to potential disqualification for financing however the dues payments were used. Had the Legislature intended the parenthetical phrase added in 1963 to be a complete definition of "regular", it should have made that intention clear or supplanted the word "regular" altogether.[30] It did not. We conclude that the word retains independent significance as a limitation upon the types of union dues automatically exempted from potential classification as financing.

The words of the Employment Security Act, like other statutes, are to be given their plain and ordinary meaning absent some indication that the Legislature intended otherwise.[31] We perceive no

[29] *Stowers v Wolodzko*, 386 Mich 119, 133; 191 NW2d 355 (1971); *Scott v Budd Co, supra*, p 37.

[30] If the Legislature so intended, it could have said:

"The payment of union dues in amounts and for purposes established prior to the inception of such labor dispute * * *."

[31] *Bingham v American Screw Products Co*, 398 Mich 546, 563; 248 NW2d 537 (1976).

evidence of a legislative intention to equate "regular union dues" with "periodic dues" enforceable through a union security agreement under § 8(a)(3) of the NLRA. The federal statute's reference to "periodic dues" was not inserted until ten years after the "regular union dues" proviso was added to the Michigan Employment Security Act.[32] We conclude that the Legislature chose the term "regular" to exclude from possible treatment as financing those dues payments required uniformly of union members and collected on a continuing basis without fluctuations prompted by the exigencies of a particular labor dispute or disputes.[33] Such a construction is consistent with ordinary usage and the common understanding of the word and serves to distinguish between sums customarily and continually collected and unusual collections for the purpose of supporting a labor dispute.

In *Burrell v Ford Motor Co*,[34] this Court approved the appeal board's determination that UAW members had not financed local labor disputes which caused their unemployment merely because a portion of their monthly membership dues had been allocated to a union strike insurance fund from which payments were disbursed to strikers involved in the unemployment-producing local disputes. The appeal board had stated:

"We believe that any differentiation between adminis-

[32] Pub L No 101, 80th Cong, 1st Sess (1947); 61 Stat 136 (Labor Management Relations Act). See Gorman, Basic Text on Labor Law: Unionization and Collective Bargaining (St. Paul: West Pub Co, 1976), p 640.

[33] The parenthetical language added in 1963 reflects much the same concern—to identify dues increased or imposed in connection with an ongoing labor dispute—but, rather than subsuming the distinction between regular and extraordinary dues, extends disqualification to some payments which otherwise would be non-disqualifying regular dues.

[34] *Burrell v Ford Motor Co,* 386 Mich 486, 494-495; 192 NW2d 207 (1971).

trative dues and Strike Insurance Fund dues is merely an internal designation by the union and still establishes that the regular union dues are established to be $5 monthly under Article 16, Section 2 * * *."

The record in *Burrell* disclosed that each UAW member's $5 monthly dues consisted of $3.75 in administrative dues ($1.75 of which was forwarded to the international union) and $1.25 for the union's strike insurance fund.[35] There was no indication that the dues had been increased at any time relevant to the labor dispute in question. Monthly dues continued to be $5 per member until the union constitution was amended on October 8, 1967.[36]

We are persuaded that the October and November, 1967 strike fund dues are not comparable to the strike fund portion of the pre-amendment monthly dues. The text of the amendment shows that each member's strike fund dues were increased from $1.25 per month to $11.25 or $21.25 per month[37] for the duration of the then existing collective bargaining emergency and perhaps until the fund contained 25 million dollars. It was not contemplated that the increased amounts would be collected indefinitely; following the emergency, dues would be set at "two hours straight time pay per month". The emergency dues provided by the amendment constituted a marked deviation from the regular pattern of dues collection; they were a temporary emergency measure whose obvious purpose was to replenish the union strike fund. The

[35] Michigan Supreme Court Records and Briefs (31 October Term, 1971), Joint Appendix, p 309a.

[36] Appeal board decision in this case.

[37] The increased amounts were, respectively, 9 and 17 times the preceding strike fund dues. Overall, each member's monthly dues were either tripled or quintupled.

Court of Appeals correctly concluded that these payments could not properly be termed "regular".

## V

Because the emergency dues payments were not "regular union dues", we need not decide whether they were "in amounts and for purposes established prior to the inception of [the] labor dispute". We turn to the question whether payment of the emergency dues constituted "financing" of the local labor disputes which caused plaintiffs' unemployment.

While the statute does not require that payments made by individuals whose disqualification is in issue be traced into the hands of workers involved in the labor dispute which caused the individuals' unemployment, the term "financing" suggests a meaningful connection between the payment or class of payments said to constitute financing and the labor dispute allegedly financed. The appeal board did not give separate consideration to the meaning of "financing", in general or as applied to this case. We therefore remand this matter to its successor, the tribunal with the most experience and expertise in the application of the act, to reconsider, in light of its own unique familiarity with the act, practical considerations and related issues implicated by this question, whether plaintiffs' emergency dues payments were sufficiently connected with the local labor disputes which caused their unemployment to constitute "financing" of those labor disputes. The parties shall be provided an opportunity to present additional evidence, arguments and briefs.

## VI

After this case was argued, this Court granted

plaintiffs permission to file supplemental briefs limited to two issues said to "necessarily result from the United States Supreme Court's recent decision in *New York Telephone Co v New York State Dep't of Labor,* 440 US 519; 99 S Ct 1328; 59 L Ed 2d 553 (1979):

"I. Is the financing proviso of § 29(8)(a)(II) of the MESA, as interpreted by the Court of Appeals, preempted by the National Labor Relations Act (NLRA)?

"II. Alternatively, can and should the financing proviso of § 29(8)(a)(II) be narrowly construed to apply only to direct payments to strikers by those sought to be disqualified thereunder and/or direct payments from a fund specially earmarked for such strikers, as opposed to a nationally established, general and regular strike insurance fund?"

Plaintiffs argue that, if the financing provision of the labor dispute disqualification is construed to disqualify them for the payment of dues required to maintain their union membership, that provision is preempted by federal labor law on two grounds: (1) it penalizes plaintiffs for maintaining membership in and providing financial support to their union, an activity expressly protected under § 7 of the NLRA; (2) under such an analysis, the state burdens and interferes with internal union decisions regarding allocation of dues and the amount and timing of dues increases, matters which Congress intended to leave free from both state and federal regulation.

So far as this Court can determine, federal preemption issues were not raised before the referee or the appeal board, were fleetingly noted in the circuit courts, and were not extensively briefed in the Court of Appeals. Except for a terse conclu-

sory statement by one circuit judge, none of those tribunals addressed these questions.

We are asked, after oral argument, to consider questions not yet decided by any court which have heretofore played a secondary role in the case and which lie in an area where the present direction of the United States Supreme Court is far from clear.[38]

It is unclear what types of cases, other than the few to reach the appellate courts, have presented "financing" issues in the past, and in which of those cases disqualification for financing a labor dispute has been enforced. Nor does it appear whether the financing provision has any practical significance outside of auto industry disputes between the UAW and the major automakers. We should also be better informed concerning the pragmatic consequences that might follow adoption of any possible definitions of "financing".

If plaintiffs did not engage in "financing" as a matter of state law, it may be unnecessary to decide in this case whether federal law preempts that provision of the state unemployment compensation act. And, even if plaintiffs are ultimately held to have financed the labor disputes which caused their unemployment, we are of the opinion that an asserted conflict between state and federal law should not be passed upon until the challenged state provision has been definitively construed. We therefore defer decision of the issues raised in plaintiffs' supplemental brief until after remand.

The briefs of the parties after remand shall

[38] In the case cited in plaintiffs' request for leave to file supplemental briefs, *New York Telephone Co v New York State Dep't of Labor*, 440 US 519; 99 S Ct 1328; 59 L Ed 2d 553 (1979), there were three opinions for the result that prevailed, none of which gained more than three signatures, and one dissenting opinion.

include (1) all historical materials that might assist this Court in determining (a) the extent to which Congress intended that the amounts and purposes of union dues should be subject to or free from state regulation or inquiry and (b) the extent to which Congress intended that the states should be permitted to disqualify, or prohibited from disqualifying, claimants from unemployment compensation benefits for financing through union dues the labor disputes that caused their unemployment; (2) any further argument the parties desire to make on the federal preemption issue; and (3) argument on the First Amendment and Equal Protection challenges raised in plaintiffs' and *amicus curiae* United Steelworkers' supplemental briefs.[39]

We remand to the board of review, the successor to the appeal board,[40] for further proceedings consistent with this opinion. We retain jurisdiction.

COLEMAN, C.J., and WILLIAMS, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred with LEVIN, J.

KAVANAGH, J., did not participate in the decision of this case.

---

[39] These issues, like those involving federal labor law preemption, were not extensively briefed or considered at prior stages of this litigation. In view of the protracted history of this case, we will, after remand, rule upon these issues as well in an effort to bring about a final resolution.

[40] 1977 PA 52; MCL 421.35(3); MSA 17.537(3).