PLYMOUTH STAMPING, DIVISION OF
ELTEC CORPORATION v LIPSHU

Docket No. 83206. Argued October 4, 1989 (Calendar No. 1). Decided
September 12, 1990.

Mike Lipshu, Jr., and other employees of Plymouth Stamping,
Division of Eltec Corporation sought unemployment compensa-
tion benefits after the company proposed during contract nego-
tiations with the employees' union that replacement employees,
hired by Plymouth while a strike was in progress, would be
permanently retained. The initial decision by the Employment
Security Commission denying unemployment compensation
benefits on the basis of the labor dispute disqualification provi-
sions of the Employment Security Act, MCL 421.29(8); MSA
17.531(8), was reversed after it was determined at an eviden-
tiary hearing that the strikers were entitled to unemployment
benefits from the date the employer hired permanent replace-
ments. The MESC Board of Review affirmed. The Wayne Circuit
Court, William Leo Cahalan, J., affirmed. The Court of Appeals,
D. E. HOLBROOK, JR., P.J., and HOOD and N. J. KAUFMAN, JJ.,
affirmed, holding that, although strikers should be disqualified
from receiving benefits during a strike even if an employer
hires replacements, that disqualification should end when and
if the employer announces that the replacements will remain
as permanent employees (Docket No. 95816). Plymouth Stamp-
ing appeals.

I. In opinions by Justice ARCHER, by Justice BOYLE, joined by
Justice CAVANAGH, and by Justice LEVIN, the Supreme Court
*held:*

Strikers who are permanently replaced by their employer
during the course of a strike are not disqualified for unemploy-
ment benefits under MCL 421.29(8); MSA 17.531(8), but are
eligible for benefits from the time of replacement until a

REFERENCES

Am Jur 2d, Unemployment Compensation § 80.
Unemployment compensation: labor dispute disqualification as ap-
plicable to striking employee who is laid off subsequent employ-
ment during strike period. 61 ALR3d 766.

subsequent event renders the labor dispute a substantial contributing cause of their unemployment.

II. In opinions by Justice LEVIN, and by Justice BRICKLEY, joined by Chief Justice RILEY and Justice GRIFFIN, the Supreme Court further *held:*

The case is remanded to the Employment Security Commission for further proceedings.

Justice ARCHER stated that as of January, 1981, the substantial contributing cause of the workers' unemployment was the fact that their jobs ceased to exist. Because the workers no longer voluntarily ceased their employment after they had been permanently replaced, they were eligible for unemployment compensation. To the extent their refusal to apply for work with their former employer after their replacement caused their unemployment, they cannot be disqualified absent a finding that they refused to apply for available work, suitable under §§ 29(6) and 29(7). The decisions of the MESC, the circuit court, and the Court of Appeals should be affirmed.

The question presented in this case is one of mixed law and fact, and the decision of the Supreme Court should have as its authority the intent of the Legislature. Where, as in this case, the Legislature has not made clear whether it intended that striking workers who have been permanently replaced be disqualified from receiving unemployment compensation, the Court must construe the act as written to give effect to probable intent. Because the act is remedial, it requires liberal construction.

Under the Employment Security Act, all unemployed workers are intended to be compensated except where expressly excluded. Examination of the categories of exempted workers reveals that unemployment compensation was intended to be withheld only where unemployment is caused by a worker's voluntary act. Permanently replaced employees are neither truly discharged nor do they actually remain employees; rather, they fall into a special category of idled workers whose status under the act can only be defined by the authors of the act. Section 29(8) prohibits unemployment compensation for workers who are out of work because of direct participation in a strike; the disqualification ends, however, where the workers are discharged by the employer.

Applying § 29(8) to the facts of this case, it is undisputed that the workers initially were disqualified from receiving unemployment compensation because their unemployment was due to a labor dispute in which they were directly involved. How-

ever, in January, 1981, that situation changed when the company permanently replaced them, i.e., their unemployment no longer was voluntary, and a labor dispute no longer was the cause of their unemployment. Rather, the substantial contributing cause of their unemployment was that their jobs ceased to exist. Under § 29(7)(a), the refusal of individual strikers to break ranks with the union and cross picket lines to apply for any available work did not render their unemployment voluntary.

The fundamental flaw in the reasoning of the opinion for reversal lies in the importance it places on the union's continuing demand that permanently replaced strikers return to jobs only as a group. While a permanently replaced worker may be disqualified for refusing to apply for available work, the refusal should not be measured under § 29(8). Workers are not required to apply unconditionally for available work. Under §§ 29(1)(c) and (e), disqualification will obtain where a worker fails without good cause to accept suitable work of which the worker had notice. Under §§ 29(6) and (7), whether work is suitable depends on a worker's background and situation and does not include positions made vacant because of a labor dispute, positions that offer substantially less favorable conditions than those prevailing locally, or positions that require resignation from a union. Thus, it would be error to order remand to determine when work became available to each worker without also ordering that a determination be made regarding whether the work was suitable.

Remand is not required, however, because the issue regarding a permanently replaced worker's duty to apply for work with a former employer is not properly before the Court. The labor dispute disqualification ended upon the strikers' permanent replacement. While the plaintiff challenged the workers' eligibility for compensation under § 29(8), it did not charge that they refused suitable work under §§ 29(1)(c) and (e). The burden of proving disqualification is on the employer. In this case, the employer did not sustain the burden.

The opinion for reversal errs in basing the workers' disqualification on individual failure to apply for work with the plaintiff in the face of their union's decision to demand group reinstatement. It is not clear that the Legislature intended to create a duty in a union to drop a demand for group reinstatement as a precondition to members' receipt of unemployment benefits. Creation of such a duty would force a union to abandon collective action, to cease being a union. In addition, had the union dropped its demand, it would have been open to

charges that it violated federal labor law by failing to fulfill its duty of fair representation.

Justice BOYLE, joined by Justice CAVANAGH, stated that the labor dispute disqualification provision of the Employment Security Act, § 29(8), ceased to control when the employer notified the strikers that they had been permanently replaced. Permanent replacement severs the causal connection between a strike and unemployment, thereby terminating the labor dispute disqualification. An employer enjoys the protection of § 29(8) only so long as it does not act to alter the employment relation. Permanent replacement of an employee disturbs the status quo of that relation and destroys both the policy considerations and the fundamental underlying assumption behind the disqualification. Whether the employer intended to discharge or merely replace the striking employees is irrelevant to the resolution of this case; rather, it is the fact of permanent replacement, not the particular intent of the employer, that destroys the underlying assumption behind the labor dispute disqualification and thereby prevents its application to the replaced strikers.

Given the parties' presentation of the issue in the Supreme Court, it is inappropriate to address the question whether some other provision of the act may bar the claimants' recovery. Remand is also inappropriate since the employer has already had the opportunity to prove which of the sixteen permanently replaced employees would have been reinstated. Its failure to do so should not entitle it to another opportunity, but rather should be outcome determinative.

Justice LEVIN stated that when the employer exercised its right to hire permanent replacements, the strike was not at that moment a substantial contributing cause of the claimants' unemployment, and the claimants were eligible for benefits from that time forward until any succeeding events again rendered the labor dispute a substantial contributing cause of the claimants' unemployment. The present record is not sufficient for a determination regarding individual claimants of whether the labor dispute, at some point after the employer's exercise of its right to hire permanent replacements, again became a substantial contributing cause of the unemployment, requiring remand to the Employment Security Commission for further factual development regarding the availability of work at Plymouth Stamping after the employer first conferred permanent status on the replacement employees, and regarding other bases regarding the claimants' eligibility for benefits.

Justice BRICKLEY, joined by Chief Justice RILEY and Justice

GRIFFIN, stated that where, as in this case, the facts presented indicate that economic strikers decline to accept a limited number of vacancies offered by an employer, and as a condition of ending the strike demand instead the immediate reinstatement of all strikers, all such strikers should remain disqualified from receiving unemployment benefits because of the continuance of a labor dispute in active progress.

While the Employment Security Act reflects a primary legislative purpose of protecting wage earners against the evils incident to involuntary unemployment, the labor dispute disqualification provisions of the act enunciate an explicit preference to deny compensation for employees unemployed because of direct participation in an active labor dispute. The labor dispute disqualification provision explicitly precludes the strikers in this case from receiving unemployment benefits because a labor dispute continued in active progress even after the employer permanently replaced them. The union initially offered to return to work unconditionally and to end the labor dispute. However, the striker's demand to return only as a group rather than as vacancies occurred constituted a new demand, separate from the earlier economic demands, which continued the labor dispute and constituted a substantial contributing cause of the strikers unemployment. While the strikers remained on strike over the issue of reinstatement, their demand for group reinstatement also precluded reëmployment of those strikers for whom vacancies existed and foreclosed a determination of which strikers would have been eligible for benefits because of the presence of replacement employees and the reëmployment of strikers who would have been rehired as future openings occurred.

Decisions by an MESC referee and the MESC Board of Review may be reversed on appeal only where the decisions are contrary to law or are not supported by competent, material, and substantial evidence on the whole record. In this case, however, the legal conclusions of the board and the courts below are error because of the failure to recognize any legal distinction between the termination or permanent discharge of strikers during a strike, as compared with the situation of strikers whose positions have been permanently filled but who retain first call on immediately available and future vacancies but nevertheless continue to strike. Permanently replaced economic strikers are entitled to unemployment compensation where the employer informs them that they either must return to work or face termination. In this case, the strikers did not allege that the employer informed the strikers of termination; to the

contrary, the employer testified that it notified the union of the existence of vacancies as they occurred. The strikers did not present evidence indicating an intent by the employer to discharge or terminate them. The record indicated that at least half of the strikers had jobs waiting for them, and the others had reasonable prospects of future reëmployment. Thus, the labor dispute continued to be a substantial contributing cause of unemployment. The fact that some, but not all, of the strikers had been replaced should not automatically entitle all the strikers to unemployment benefits as long as they continued the strike.

The determination of whether the labor dispute qualifications of MCL 421.29(8); MSA 17.531(8) apply should proceed case by case, on the basis of a determination of whether the labor dispute in active progress continued to be a substantial contributing cause of unemployment. In this case, even though the bargaining position of the strikers to decline any job vacancy unless and until all strikers could return should result in their disqualification, we concur in the remand to the MESC to determine the number of positions that became available after the employer hired permanent replacements, the date when each position became available, which claimant was entitled to fill each position, and whether the employer notified the union of each vacancy. Any striker for whom a position became available during the strike should be ineligible for benefits from the time each position became available.

Affirmed and remanded.

168 Mich App 21; 424 NW2d 530 (1988) affirmed.

UNEMPLOYMENT COMPENSATION — LABOR DISPUTE DISQUALIFICATION
    — ELIGIBILITY FOR BENEFITS.

Strikers who are permanently replaced by their employer during the course of the strike are not disqualified for unemployment benefits under the Employment Security Act, but are eligible for benefits from the time of replacement until a subsequent event renders the labor dispute a substantial contributing cause of their unemployment (MCL 421.29[8]; MSA 17.531[8]).

*Fitzgerald, Hodgman, Cox, Cawthorne & McMahon* (by *William L. Hooth*) for the appellant.

*Rothe, Mazey, Mazey & Hamburger, P.C.* (by *William Mazey*), for the appellees.

Amici Curiae:

*Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, P.C.* (by *Theodore Sachs* and *Mark Brewer*), for Michigan State AFL-CIO.

*Kim Arthur Siegfried,* Assistant General Counsel, United Steelworkers of America, AFL-CIO•CLC, for United Steelworkers of America, AFL-CIO•CLC.

*Honigman, Miller, Schwartz & Cohn* (by *Charles H. Tobias* and *Kevin I. Green*) for Guardian Industries Corp.

ARCHER, J. (*for affirmance*). We granted leave limited to the issue whether the employee-claimants, who were engaged in a strike against their employer, were disqualified for unemployment benefits pursuant to the labor dispute provisions of the Michigan Employment Security Act, MCL 421.29(8); MSA 17.531(8), when they were permanently replaced during the course of the strike.[1]

I believe the workers' disqualification ended upon their permanent replacement and any remand must instruct the MESC to determine the suitability of any available work under § 29 of the MESA.

### FACTS AND PROCEEDINGS

In the fall of 1980, workers and management of the Plymouth Stamping Division of Eltec Corporation were unable to come to an agreement for the renewal of a collective bargaining agreement that expired on September 1, 1980. Negotiations broke down when workers refused to agree to management demands for wage and benefit concessions equaling approximately thirty percent of the work-

[1] 432 Mich 891 (1989).

ers' current wages. The workers stayed on the job for one week after the expiration of the old contract, but on September 9, the workers struck the company. The company never ceased production during the strike, operating first with the efforts of management and members of the families of company executives.

As the strike progressed, the company gradually hired replacements. At the end of December, 1980, the company informed the replacements that the company considered them permanent; that is, they would be retained even in the event the strike was settled. On January 15, 1981, the company's attorney informed the union's chief negotiator that the striking workers had been permanently replaced. In the event the strike was settled, the workers could reapply for work and would be rehired only as openings became available. If they wished to work at Plymouth Stamping, the strikers could only do so under terms imposed by the company. Any strikers who agreed to return to Plymouth Stamping would have to accept the same terms offered the new replacement workers.

Upon learning of their permanent replacement, the striking workers applied for unemployment benefits. The Employment Security Commission initially denied benefits, reasoning that the workers were disqualified pursuant to the labor dispute disqualification provision of the MESA, MCL 421.29(8); MSA 17.531(8). The workers appealed to the MESC, which conducted a hearing.

At the hearing, the company claimed that it only replaced the workers and did not "discharge" or "terminate" them. The company president testified that between January, 1981, and May, 1982, a total of thirty-seven openings occurred within the strikers' bargaining unit. The record discloses, however, that the company informed the union of

the existence of only seven of those openings in February or March of 1981 when, while in the coffee room of the union office, the company's attorney told the union negotiator that he had seven openings he "can offer."

While the union ultimately acceded to the economic demands of the company's final proposal, the company refused the strikers' last and only demand, that the company rehire the strikers as a group, and not one at a time. Consequently, these claimants refused to apply for work at Plymouth Stamping.

A referee found that the workers were entitled to unemployment compensation after January 15, 1981, the date on which they were notified through their union representative of their permanent replacement. The MESC Board of Review affirmed this decision as did the Wayne Circuit Court and the Court of Appeals.[2] I would also affirm.

I

The facts of this case disclose the following: In the late 1970's and early 1980's, Plymouth Stamping, like many other companies involved in the automotive industry, experienced difficult times. Like other companies in the industry, Plymouth Stamping responded by demanding wage and benefit concessions from its workers—thirty percent cuts in wages and benefits. The wages and benefits the company offered the union actually decreased as negotiations proceeded. As the opinion for reversal aptly points out, the National Labor Relations Board found that the company was engaged in legal "hard bargaining."

Faced with the company's demands, the workers had three choices. They could accede to the com-

_____
[2] 168 Mich App 21; 424 NW2d 530 (1988).

pany's demands (as did many workers in similar situations), they could quit, or they could strike.

Had the workers quit, they most likely would have been eligible for unemployment compensation. Leaving work because of substantial changes in wages or conditions of employment constitutes "good cause attributable to the employer" such that a worker will not be disqualified from receiving unemployment compensation under § 29(1)(a) of the MESA.[3] *Copper Range Co v Unemployment Compensation Comm,* 320 Mich 460; 31 NW2d 692 (1948); *Keith v Chrysler Corp,* 390 Mich 458; 213 NW2d 147 (1973). Cf. *Lasher v Mueller Brass Co,* 62 Mich App 171; 233 NW2d 513 (1975).

However, the workers wanted to keep their jobs and hoped for a better deal, so they struck. They struck, presumably, with a clear understanding that, under state law, they would receive no unemployment compensation while on strike, while, under clear federal precedent, they could lose their jobs to permanent replacements. I do not believe they contemplated that they could both lose their jobs *and* be ineligible for unemployment compensation.

What employers will now understand, however, is that this Court has put them in a "heads I win, tails you lose" situation. Employers who face economic downturns now have every incentive to demand large concessions from unions in the hope of precipitating a strike. If such a labor dispute occurs, the employer can hire permanent replacements at the terms last offered the union. At that point, the company has an entirely new workforce at terms the company dictates. To the extent any of the former employees become members of the new workforce, it is only as vacancies occur and

---

[3] MCL 421.29(1)(a); MSA 17.531(1)(a).

only according to the company's terms. After to-
day, none of the workers whose jobs are filled by
replacements will be entitled to unemployment
compensation.

After permanently replacing the strikers, the
company has effectively laid off its workforce and
hired another, perhaps smaller, complement of
workers willing to work at terms the company
dictates. Under federal labor law, these workers
have the right to decertify the union if the com-
pany asks for an election, and the replaced work-
ers will have no rights to vote in that election if it
is held twelve months after the strike began.
While the workers suffer the hardships, the em-
ployer pays no costs in terms of future assess-
ments for unemployment compensation funds so
long as the striking workers refuse to become, in
effect, permanent replacements themselves.

Such a result cannot have been the intention of
the Legislature when it enacted § 29(8). This provi-
sion was intended to promote state "neutrality" in
labor disputes by preventing strikers from receiv-
ing benefits ultimately assessed against the struck
employer. It was also intended to deny unemploy-
ment benefits to workers who voluntarily cause
their unemployment. It cannot have been intended
as a weapon with which employers can hire a
cheaper labor force without taking the responsibil-
ity the MESA places on employers in almost all
other situations—the responsibility of contributing
to an insurance scheme intended to insulate unem-
ployed workers and their families from the harsh-
est effects of involuntary unemployment.

The facts of this case are closely analogous to
those presented this Court forty-two years ago in
*Copper Range Co, supra.* In that case, a mining
company, at the expiration of a collective bargain-
ing agreement, offered its workers a renewal con-

tract at substantially lower wages, an offer which the workers refused. The miners were willing to work, but only for the wages they drew under the expired contract. Due to submarginal profitability, the mining company decided to close the mine instead of paying a higher wage. The company then challenged the workers' claims for unemployment compensation, not under the labor dispute disqualification provisions, but by charging that the workers, by refusing a new contract at reduced wages, had voluntarily left work without good cause attributable to the employer. This Court held in favor of the workers, stating,

> To place the stamp of judicial approval upon the contentions of appellee in the instant case would be tantamount to the issuance of a notice to all employers in Michigan that, whenever they are confronted with economic loss, they can demand an abrogation of their working agreements and reduce compensation to a point unacceptable to employees, and thereby absolve themselves of the responsibilities imposed upon them by the unemployment compensation act. [320 Mich 470-471.]

I likewise refuse to condone an attempt by an employer to replace an entire workforce without taking any responsibility for the unemployment which results from those actions.

By reviewing this case in light of our holding in *Copper Range*, it becomes apparent that at the heart of the Court's decision lies a proposition so anachronistic to the purposes of Michigan's employment law that it threatens the most fundamental bases of worker autonomy: job security and the rights to bargain collectively.

II

More than disagreeing with the result the Court

reaches and the consequences of its opinion, I believe the Court's analysis is flawed.

I approach the question presented in this appeal as one of mixed law and fact. The MESC and the trial court found as fact that these workers were "discharged" from Plymouth Stamping and therefore eligible under *Knight-Morley Corp v Employment Security Comm,* 352 Mich 331; 89 NW2d 541 (1958), for benefits. Therefore, it is possible for this Court to review the MESC decision as this Court traditionally reviews the factual findings of that body, i.e., by determining whether its decision is supported by competent, material, and substantial evidence. See *Smith v Employment Security Comm,* 410 Mich 231, 260-261; 301 NW2d 285 (1981); *Linski v Employment Security Comm,* 358 Mich 239; 99 NW2d 582 (1959).

Although the MESC's finding of "discharge" is supported by the record, I am reluctant to view this case as presenting a question of fact. The decision in this case should not rest on whether the MESC or this Court believes permanent replacement is closer to "discharge" than it is to continuing employment; our decision should not depend on whether we believe these workers to have remained "employees" after their permanent replacement. Rather, as the opinion for reversal admits, our decision must find its authority in the intent of the Legislature. The practical reality is that permanently replaced employees are neither truly "discharged" in the same manner other unemployed workers are nor are they actually still "employees." They fall into a special category of idled workers whose status under the MESA can only be defined by the authors of that act.

Although it has the power to do so, the Legislature has not made clear whether it intends to disqualify striking workers who have been perma-

nently replaced from the benefits of the MESA. In the absence of a clear pronouncement, it is the duty of this Court to construe the act as written in an effort to give effect to the Legislature's probable intent.

We have a clear duty to construe this statute liberally as a remedial statute. Since the time when the MESA was but a few years old, this Court has recognized that it is a remedial statute entitled to a liberal construction. See, e.g., *Godsol v Unemployment Compensation Comm*, 302 Mich 652; 5 NW2d 519 (1942); *Auten v Unemployment Compensation Comm*, 310 Mich 453; 17 NW2d 249 (1945); *Copper Range Co v Unemployment Compensation Comm, supra.* "[MESA] was enacted in the interest of public welfare to provide for assistance to the unemployed and as such, is entitled to a liberal interpretation." *Godsol* at 665.

Compensation is intended for all unemployed workers except those whom the Legislature clearly intended to exclude. "[C]ourts are without power to deprive those entitled thereto of the benefits of the act, unless they are expressly precluded therefrom by its provisions." *Copper Range* at 470.

Therefore, individuals who have lost their jobs to permanent replacements are entitled to MESA benefits in the absence of a clear legislative intent to exclude them.

III

Section 29(8) of the Employment Security Act, MCL 421.29(8); MSA 17.531(8) provides, in pertinent part:

An individual shall be disqualified for benefits for a week in which the individual's total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up opera-

tions caused by that labor dispute, in the establish-
ment in which the individual is or was last
employed . . . .

This section prohibits the provision of unemploy-
ment compensation to workers who are out of
work because they participate directly in a strike.

However, when this Court construed this statute
in 1958, it held that striking workers' disqualifica-
tion under § 29(8) ends if they are "discharged" by
the employer. In *Knight-Morley, supra,* we rea-
soned that there was sufficient evidence to support
a finding of "discharge" where an employer (1)
permanently replaced its striking workers, (2) re-
moved their time cards from the time card rack,
(3) canceled their group life insurance policies, and
(4) published a notice in a newspaper stating that
the workers "are no longer employees of this
company." *Knight-Morley* at 333. This Court held
that the MESC's factual findings that the workers
were discharged were amply supported by the
record. We also held that, as a matter of law, this
discharge ended the workers' disqualification.

This case differs from *Knight-Morley,* however,
because, although Plymouth Stamping perma-
nently replaced the striking employees and noti-
fied them of their replacement, there is no evi-
dence in the record regarding the fate of these
workers' time cards, vacation pay, life or health
benefits, or whether the strikers were still listed
on the company's employment rolls. It is this lack
of other evidence showing "discharge" that puts
the question squarely before us: Can permanent
replacement alone terminate a striking worker's
disqualification under § 29(8)?

A

At the heart of the MESA is the notion that

workers who are unemployed through no fault of their own are entitled to a subsistence wage to assist them and their families in keeping body and soul together. The Legislature determined that "[i]nvoluntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family . . . ." MCL 421.2; MSA 17.502.

To achieve this monumental goal, the Legislature created a broad entitlement to unemployment benefits. Rather than identifying specific categories of workers entitled to benefits, the MESA creates an entitlement in *all* unemployed workers except workers in sixteen specific categories embodied in § 29.[4]

By examining each category of worker exempted from unemployment compensation, it becomes clear that the Legislature intended to withhold compensation from only those workers whose unemployment is *caused* by a *voluntary* act. With few exceptions, both parts of this test, the causational and the volitional, must be met to bring about disqualification. For example, an assaultive worker (assault always contemplates intentional, and, therefore, voluntary, acts) who is laid off can collect benefits *except* when his unemployment is *caused by* his assaultive behavior. MCL 421.29(1)(h); MSA 17.531(1)(h).[5] A worker who "voluntarily" leaves work is disqualified, but the law carefully qualifies "voluntary" as meaning "without good cause and attributable to the employer." MCL

---

[4] MCL 421.29; MSA 17.531 is entitled "Disqualification for benefits."

[5] This subsection states: "(1) An individual shall be disqualified for benefits in the following cases in which the individual . . . (h) [w]as discharged *for an act* of assault and battery connected with the individual's work." (Emphasis added.)

421.29(1)(a); MSA 17.531(1)(a). A worker is disqualified for refusing to seek reëmployment only when doing so "without good cause." MCL 421.29(1)(c), (d); MSA 17.531(1)(c), (d). The act creates only one explicit exception to the causational test. In § 29(1)(m), the law provides that a worker who steals after notification of a pending layoff may be disqualified. This subsection is thus the only portion of the act which would explicitly allow disqualification for a voluntary act which did not actually "cause" unemployment.

The language of § 29(8), the labor dispute disqualification provision, similarly contemplates a disqualification only for unemployment voluntarily caused by the worker. The statute's language requires a volitional test when it states "[a]n individual shall not be disqualified under this subsection if the individual is not directly involved in the dispute." The causational element is embodied in the words "*due to* a labor dispute."

Therefore, I disagree with the dicta presented in this Court's opinion in *Smith, supra,* that the labor dispute disqualification is an exception to the general rule that grants relief for involuntary unemployment. See *Smith* at 252-254. This Court is under a firm duty imposed by the rules of statutory construction to construe this statute so as to follow its general intent except where the Legislature has clearly created an exception through unambiguous language. Thus, I reiterate the call raised by Justice BLAIR MOODY's dissenting opinion in *Smith*[6]—that we should never interpret a section of a statute without constant reference to the whole.

Applying § 29(8) to the facts of this case, it is undisputed that the workers who struck Plymouth

[6] 410 Mich 274.

Stamping in September, 1980, were initially disqualified from receiving unemployment compensation. Their unemployment was "due to a labor dispute" in which they were "directly involved." In January of 1981, however, that situation changed. When the company permanently replaced the workers, their unemployment was no longer voluntary. Nor did a labor dispute remain the cause of their unemployment.

### B

The workers' unemployment was no longer voluntary because, once permanently replaced, they had no jobs away from which they voluntarily chose to stay. Their jobs ceased to exist. They were no longer "employees" of Plymouth Stamping as that term is generally defined.[7] Were they unconditionally to seek reëmployment at Plymouth Stamping, they would be hired only as openings occurred. They would begin work under a new contract. In all practical aspects, these workers could only obtain work at Plymouth Stamping as new employees. The only aspect of the replaced workers' status that set them apart from other persons who might apply for work at Plymouth Stamping was the fact that these workers were first in line for available employment, a right

---

[7] The National Labor Relations Act and decisions of the United States Supreme Court consider striking workers "employees" under the NLRA. See NLRB v Mackay Radio & Telegraph Co, 304 US 333; 58 S Ct 904; 82 L Ed 1381 (1938), and 29 USC 152(3). The workers at issue here, however, were not simply on strike; they had been permanently replaced. In this situation practical realities must prevail over legal definitions.

The definition of "employee" as that term is used in federal statutes is not dispositive here. Even under federal law, the meaning of the term shifts with its context. For example, under federal labor law, for the purpose of determining eligibility to vote in a decertification election, replaced strikers are "employees" for only twelve months after the strike commences. See 29 USC 159(c)(3); Bio-Science Laboratories v NLRB, 542 F2d 505 (CA 9, 1976).

recognized in *Laidlaw Corp v NLRB*, 414 F2d 99 (CA 7, 1969), cert den 397 US 920 (1970). They were no more "voluntarily" unemployed from Plymouth Stamping than they were "voluntarily" unemployed from any other business in the area where they were qualified to work and could apply.

Indeed, the MESA disqualifies workers who voluntarily refuse to seek reëmployment at their former workplace, but only when those workers refuse "without good cause." Section 29(1)(d). Yet, the law recognizes that a worker may have "good cause" for refusal to accept reëmployment when that reëmployment would pay substantially less than the workers' former wage—as did the employment offered the workers here. MCL 421.29(7)(b); MSA 17.531(7)(b). See *Keith v Chrysler Corp, supra.* Cf. *Lasher v Mueller Brass Co, supra.*

The refusal of the individual strikers here to break ranks with the union and apply for any available work does not make their unemployment "voluntary" under clear terms of § 29(7)(a) of the act. In fact, the Legislature clearly prohibits this Court from denying benefits because an individual refused to cross a picket line or break union ranks in an effort to secure work.

> Work shall not be considered suitable *and benefits shall not be denied under this act* to an otherwise eligible individual for refusing to accept new work under any of the following conditions: (a) if the position offered is vacant due directly to a . . . labor dispute . . . [or] (c) if as a condition of being employed, the individual would be required to join a company union *or to resign from* or refrain from joining *a bona fide labor organization.* [MCL 421.29(7); MSA 17.531(7). Emphasis added.]

A worker is still involuntarily unemployed and,

therefore, entitled to benefits, even in situations where there is work available, if the worker cannot accept that work without crossing a picket line or terminating union membership. Since the union adopted a position that none of these claimants would work unless the company gave work to each of them, it is apparent that none could accept any of the thirty-seven supposed vacancies without leaving the union.[8] Their failure to leave the union and apply for work at Plymouth Stamping does not make their unemployment "voluntary" as a matter of fact or as a matter of law. Benefits "shall not be denied" for their failure to apply for available work at Plymouth Stamping.

C

Just as the replaced workers' unemployment ceased being voluntary, under the "substantial contributing cause" formula announced in *Smith* at 261, the strike ceased to be the "cause" of unemployment after permanent replacements filled the jobs. The hiring of replacements was an intervening event which cut off the dispute as the cause of the unemployment. At the moment it replaced the workers, the company caused their unemployment.

A unanimous Supreme Court of California recognized this break in causation in *Ruberoid Co v California Unemployment Ins Appeals Bd*, 59 Cal 2d 73, 81; 27 Cal Rptr 878; 378 P2d 102 (1963), when it dealt with the exact issue now before this

---

[8] Federal labor law grants unions the clear right to expel members or impose fines in lieu of expulsion if those members cross their union's picket line. *NLRB v District Lodge No 99,* 489 F2d 769 (CA 1, 1974); *NLRB v Oil, Chemical & Atomic Workers,* 619 F2d 708 (CA 8, 1980); *Local 1255, International Ass'n of Machinists & Aerospace Workers v NLRB,* 456 F2d 1214 (CA 5, 1972).

Court.[9] An analogy used in that court's opinion is helpful here:

> [T]he prospective theatergoer who hesitates to purchase a ticket no longer retains an option to attend the performance once the management has sold all the seats. The occupancy of the theater destroys the theatergoer's possibility of exercising volition as to attending the performance. The cause of his nonattendance becomes, at that point, the full occupancy of the theater rather than the failure to buy a ticket. The union member who debates whether he should participate in the picketing or cross the picket line exercises no more effective choice than the theatergoer. Even if the worker were to decide to abandon the picketing or cross the line, the opportunity for effective decision or for realistic volition on his part is foreclosed as of the time the employer replaces him with another worker and terminates their relationship.

Although it might be argued that the strike

---

[9] The attempt in the opinion for reversal to distinguish *Ruberoid, Brannan Sand & Gravel v Industrial Claim Appeals Office of Colorado,* 762 P2d 771 (Colo App, 1988), and *Baugh v United Telephone Co,* 54 Ohio St 2d 419; 377 NE2d 766 (1978), as "replacement 'plus' cases," *post,* p 57, is thoroughly disingenuous. Whatever minor factual differences may have existed in the records of those cases which might arguably distinguish them from this case simply were not relied upon by those courts. In *Baugh, supra,* p 422, the court narrowed down the "precise question" it faced as "whether the statutory disqualification . . . terminates when the employer permanently replaces the employee . . . ." In *Ruberoid, supra,* p 81, the court stated, "the *replacement* became the intervening event which cut off the dispute as the cause of unemployment." (Emphasis added.) In *Brannan, supra,* p 774, the court stated, "[w]hen an employer permanently replaces an employee, the employer's action severs the labor dispute as the cause of a claimant's unemployment, and the claimant is no longer voluntarily unemployed."

Nothing in the analyses employed by these courts turned on the method by which the employees' replacement was communicated or whether there was something "plus" the replacement in the employers' actions. There is no difference between the issue in this case and the issues in *Ruberoid, Baugh,* and *Brannan.* The only difference, between those cases and this case, tragically, lies in the legal conclusions the Court draws here.

remained *a* substantial contributing cause of the
workers' unemployment, an honest evaluation of
the practical realities of the workers' situation as
of January, 1981, shows that *the* substantial con-
tributing cause of their unemployment was the
fact that their jobs *ceased to exist.* Because the
workers no longer voluntarily caused their unem-
ployment after they had been permanently re-
placed, they were eligible for unemployment com-
pensation. So held the mesc, the circuit court, and
the Court of Appeals. So would I also hold.

IV

The most fundamental flaw in the Court's rea-
soning lies in the importance it places on the
union's continuing demand that the permanently
replaced strikers take jobs at Plymouth Stamping
only as a group. The opinion for reversal reasons
that this demand "continued the labor dispute"[10]
and caused the unemployment of any worker qual-
ified to fill any existing vacancy. However, the
Court admits that the union's demand did not
cause the unemployment of any worker for whom
a vacancy did not exist. "Had the union
. . . [been] willing to return to work, those strik-
ers whose positions were filled by permanent re-
placements would undoubtedly have been entitled
to unemployment compensation until such time
that vacancies become available." *Post,* p 51. The
Court's remand order contemplates that any re-
placed worker for whom a vacancy was unavail-
able is entitled to compensation for that period
when a vacancy did not exist.

By making this argument, the Court has recast
the analysis regarding the causation of the strik-

10 *Post,* p 51.

ers' unemployment in a very significant manner. The Court admits that after permanent replacement the cause of these workers' unemployment was no longer the original "labor dispute," but the workers' refusal to come back to work, one at a time, to fill existing vacancies. While the Court is correct that a permanently replaced worker can be disqualified for refusing to apply for available work, it errs when it measures such a refusal under § 29(8) of the MESA, rather than the other subsections of § 29 that deal explicitly with the duty of an unemployed worker to apply for or accept available work.

A

By conditioning eligibility for unemployment compensation on the nonexistence of a vacancy a particular worker was qualified to fill, the Court posits a duty on the part of permanently replaced workers unconditionally to apply for work at their former place of employment as a precondition for eligibility for unemployment compensation. In creating this duty, the Court completely ignores the language of the MESA wherein the Legislature, the body with plenary authority to make law in this area, has delineated the duty of an unemployed worker to apply for and accept available work. The Legislature has indicated that workers *do not* have a duty to apply for available work unconditionally, but that workers have a duty to apply for and accept only "suitable work."

In §§ 29(1)(c) and 29(1)(e), the MESA provides that an individual is disqualified from receiving unemployment benefits when that individual "[f]ailed without good cause to apply for available *suitable* work of which the individual was notified" or "[f]ailed without good cause to accept *suitable*

work when offered the individual . . . ."[11] Assuming that, on remand, the company can prove that the permanently replaced workers had been notified of any available work at Plymouth Stamping,[12] under the language of § 29(1)(c) and § 29(1)(e), they are not disqualified from receiving unemployment benefits absent some indication that the available employment was also "suitable."

The suitability of available work is determined under §§ 29(6) and 29(7) of the MESA. The language of these subsections indicates that their provisions must be used to measure the suitability of *any* work the nonacceptance of which affects an individual's qualification to receive unemployment benefits. Section 29(6) provides:

> In determining whether or not work is suitable for an individual, the commission *shall consider* the degree of risk involved to the individual's health, safety, and morals, the individual's physical fitness and prior training, the individual's experience and prior earnings, the individual's length of unemployment and prospects for securing local work in the individual's customary occupation, and the distance of the available work from the individual's residence. [MCL 421.29(6); MSA 17.531(6). Emphasis added.]

Section 29(7) provides:

> Work *shall not be considered suitable* and bene-

---

[11] MCL 421.29(1)(c), (e); MSA 17.531(1)(c), (e). (Emphasis added.)

[12] The record in this regard is, at most, equivocal. Though the opinion for reversal asserts "the employer testified that it notified the union of the existence of vacancies as such occurred," *post*, p 54, the only mention in the record of such notification is testimony from the union negotiator that on one occasion, sometime in February of 1981, "I was in the coffee room of our office and Mr. Hooth [the company's attorney] then told me that he'd gotten 7 job openings—he'd got 7 job openings that he can offer. He didn't say he would offer, he said he can offer."

fits *shall not be denied* under this act to an otherwise eligible individual for refusing to accept new work under any of the following conditions: (a) if the position offered is vacant due directly to a strike, lockout, or other labor dispute; (b) if the remuneration, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality; (c) if as a condition of being employed, the individual would be required to join a company union or to resign from or refrain from joining a bona fide labor organization. [MCL 421.29(7); MSA 17.531(7). Emphasis added.]

Section 29(6) establishes the factors that the unemployment compensation commission "shall" consider when determining whether an offer of work is "suitable," so that its refusal would subject an individual to disqualification. Section 29(7), on the other hand, establishes three mandatory, minimum substantive requirements which all new work must meet in order to be "suitable" under the act. As the Precedent Manual used by MESC hearing referees points out:

Each of the three (3) standards above are *minimum* standards. It is mandatory that these standards be considered in all cases of job offers or referrals to work. This imposes a duty on the MESC staff to assure themselves that the work offered meets these minimum standards before denying a claimant benefits if he refuses to accept such new work, regardless of whether he raises the issue himself. [Emphasis in original.][13]

Thus, the Court errs by ordering a remand to

---

[13] Section 76.219. Obviously, the Precedent Manual is not precedent before this Court. The analysis of the MESC, however, is clearly relevant in a dispute over a seldom-litigated provision of the MESA, because the administration of that act's provisions is the MESC's reason for existing.

determine when work became available to each worker without also ordering a determination regarding whether any available work was also "suitable."

B

At first blush, it appears that § 29(7) directly contradicts § 29(8) since they both arguably apply to situations where a labor dispute "causes" unemployment. Section 29(8) disqualifies claimants who have left work because of a labor dispute; § 29(7) specifically forbids the disqualification of those who refuse to take work at a struck plant. A closer look at the principles behind § 29(7), however, reveals that it is meant to apply in a slightly different situation from that in which § 29(8) applies. While § 29(8) applies to situations in which workers temporarily leave work because of a strike and refuse to go back to their jobs at the struck establishment,[14] § 29(7) entitles workers to refuse as unsuitable "new work" with any employer when that work falls into any of three categories.

Section 29(7) of the MESA contains "labor standards" provisions which Congress mandated all state unemployment compensation schemes should have in order to qualify employers for federal unemployment tax credit. It has been part of the MESA since its enactment and copies language mandated by the federal Social Security Act of 1935. The intent of Congress in requiring states to enact labor standards provisions was the protec-

_____

[14] Section 29(8) also clearly applies to situations in which laid-off workers refuse, because of a labor dispute, to return to their old jobs on the date work would have been available but for the strike. See *Clapp v Unemployment Compensation Comm*, 325 Mich 212; 38 NW2d 325 (1949).

tion of workers.[15] The labor standards provisions
prevent employers from using unemployment com-
pensation entitlements to depress wage rates or
other working conditions substantially below those
prevailing for similar work in the locality or to
break strikes or unions.[16]

It appears that § 29(7) has been construed in
only a handful of published opinions. One of those
opinions, *Anderson v Top O'Michigan Rural Elec-
tric Co,* 118 Mich App 275; 324 NW2d 603 (1982),
illustrates its applicability to this case.

In *Anderson,* the claimants were line trade em-
ployees and field technicians. Clerical workers,
members of the same union in another bargaining
unit, called a strike, and the claimants followed
their union's instruction and honored the clerical
workers' picket line, in violation of a no-strike
provision in their contract. They were initially
disqualified from receiving unemployment compen-
sation under § 29(8), but during the course of the
strike, they began working for other companies
which subsequently laid them off. After their
layoff from their subsequent employment, the
workers were pronounced eligible for unemploy-
ment benefits.[17]

Upon learning of the removal of the claimants'
disqualification, Top O'Michigan sent the claim-

[15] See statement of Senator Harrison, HR 7260, 74th Cong (1st
Sess), 79 Cong Rec 9271 (1935).

[16] While Congress required complying state statutes to contain
strike-breaker provisions, it left the states free to determine whether
to enact labor dispute disqualification provisions. See *New York
Telephone Co v New York Dep't of Labor,* 440 US 519; 99 S Ct 1328;
59 L Ed 2d 553 (1979).

[17] An individual's disqualification imposed or imposable under
this subsection shall be terminated by the individual's perform-
ing services in employment with an employer in at least 2
consecutive weeks falling wholly within the period of the
individual's total or partial unemployment due to the labor
dispute . . . . [MCL 421.29(8); MSA 17.531(8).]

ants letters offering them their old jobs. The claimants refused because the union's picket line remained. The employer then challenged the claimant's eligibility for compensation under § 29(1)(e) of the act, charging the claimants with refusing an offer of suitable work and noting that the union's refusal to allow these claimants to cross a picket line established by workers in another bargaining unit violated the no-strike provisions in the contract.

The Court of Appeals upheld an award of benefits, citing § 29(7), and rejecting Top O'Michigan's argument that the section did not apply because the offer was not an offer of "new work," but, rather, an offer of their old jobs under the same terms and conditions. The court held that the claimants' disqualification ended upon their brief employment elsewhere and their renewed eligibility for unemployment benefits did not terminate when they refused specific offers of employment at exactly the same terms. They were still eligible precisely because a labor dispute caused their failure to accept available work. In other words, the court recognized that the Legislature did not create a duty to cross a picket line in order to receive unemployment compensation. Neither did the Legislature create a duty in the union to remove that picket line to enable the workers to take their old jobs back, even where the picket line is established in violation of a collective bargaining agreement.

Of course, the applicability of § 29(7) to this case depends upon a determination that any work available at Plymouth Stamping was "new work." To answer that question, I look to cases in which the labor standards provisions were used to evaluate employment offered to workers who were on indefinite layoff status before being recalled to

take jobs at their struck former employers. The status of indefinitely laid-off workers is directly analogous to that of permanently replaced workers. In both situations, the workers are unemployed with no indication of whether or when they might be recalled, and both classes of workers have rights to be recalled first when vacancies occur.[18]

In *Campos v California Employment Development Dep't,* 132 Cal App 3d 961; 183 Cal Rptr 637 (1982), the California Court of Appeals addressed the question whether workers on indefinite layoff are disqualified from receiving unemployment benefits when they refuse to accept recall offers in the course of a trade dispute. In that case, claimants, seasonal workers in food processing plants, were initially denied unemployment benefits when they refused to cross picket lines established by their union when recalled to work from indefinite layoff status. The California Court of Appeals held that the workers were not disqualified on the basis of a labor dispute disqualification provision because of

[18] In fact, indefinitely laid-off workers have greater rights than those who are permanently replaced. In most situations, indefinitely laid-off workers will be notified of vacancies they can fill, while under *Laidlaw,* permanently replaced workers have the right to be rehired only when they apply for work and vacancies occur. An employer has no duty to inform a permanently replaced worker regarding job vacancies.

The United States Department of Labor, in its Program Letter No. 984, September 20, 1968, describes the status of an indefinitely laid-off worker in a manner which shows the similarity between that worker's status and the position of a permanently replaced employee:

An indefinite layoff, that is, a layoff for an indefinite period with no fixed or determined date of recall, is the equivalent of a discharge. The existence of a seniority right to recall does not continue the contract of employment beyond the date of layoff. Such a seniority right is the worker's right; it does not obligate the worker to accept the recall and does not require the employer to recall the worker. It only requires the employer to offer work to the holder of the right, before offering it to individuals with less seniority.

the labor standards provision.[19] The court reasoned that the employer's recall notice constituted an offer of "new work" within the meaning of the strike-breaker provision, because it was an offer of a new contract of employment, especially since the workers had no contractual right to recall within any specified time period and because the previous employment relationship was terminated prior to recall.[20]

Although *Campos* is clearly not binding upon this Court, I find its analysis compelling, especially in light of the reliance the California court placed on federal authority. The court noted that because strike-breaker provisions of the unemployment insurance statutes are mandated by federal statute, interpretations of the federal statute by federal agencies such as the Department of Labor are entitled to great weight. See *Brennan v Owensboro-Daviess Co Hosp*, 523 F2d 1013 (CA 6, 1975).

The California court cited the Department of Labor's Unemployment Insurance Program Letter No. 984 (1968), in which the Secretary of Labor considered the application of the term "new work" under the federal Unemployment Tax Act, 26 USC 3304(a)(5)(B).[21] The program letter states:

[19] California's labor standards provision, Unemployment Insurance Code § 1259, is also lifted directly from the Social Security Act of 1935 and its language is identical to that of § 29(7)(a).

[20] The California court's holding in *Campos* seems contrary to the decisions of this Court in *Abbott v Unemployment Compensation Comm*, 323 Mich 32; 34 NW2d 542 (1948), and *Clapp*, n 14 *supra*. In those cases, this Court held that previously *temporarily* laid-off workers were disqualified from receiving unemployment benefits when they refused to cross picket lines to answer recall notices. I do not find these cases controlling, however, because neither case dealt with the applicability of § 29(7) and because in neither case could it be said that the claimants were being offered "new work." In both cases, the claimants were only temporarily laid-off due to short-term slowdowns in production prior to the labor dispute, and the employer adequately established that but for the labor dispute the workers would have returned to their same jobs under their old contracts. See n 14.

[21] The act currently embodies the federal mandate that state unemployment insurance schemes contain labor standards provisions.

"[A]n offer of new work includes . . . an offer of re-employment to an unemployed individual by his last (or any other) employer with whom he does not have a contract of employment at the time the offer is made. . . . The question is whether the offer of re-employment is an offer of a new contract of employment. . . . An indefinite layoff, that is a layoff for an indefinite period with no fixed or determined date of recall, is the equivalent of a discharge." . . . "[I]f the phrase 'new work' were limited to work with an employer for whom the individual has never worked, it is plain that the purpose of section 3304(a)(5) would be largely nullified. It can make no difference, insofar as that purpose is concerned, that the unemployed worker is offered re-employment by his former employer rather than re-employment by one in whose employ he has never been. . . . The question is whether the offer of re-employment is an offer of a new contract of employment." [*Campos* at 968.]

I agree with the California Court of Appeals that the interpretation of the Department of Labor is entitled to great weight, particularly since that department is under Congressional mandate to ensure that all states' unemployment schemes contain labor standards provisions in order to qualify employers for federal unemployment tax credit. See 26 USC 3304(a)(5).

The interpretation of § 29(7) by the MESC Board of Review is also entitled to some weight in our analysis since it is that body whose job it is to interpret and apply the provisions of the MESA. The Board of Review interpreted § 29(7) in *Wells v Detroit Coil Co,* B76-2593-53446 through B76-2594-53457 (1978), when it ruled that indefinitely laid-off workers were not disqualified from receiving unemployment compensation when they refused to answer recall notices at their struck former em-

ployer. The claimants were initially unemployed
for lack of work, and their names were on a
seniority list for recall to vacancies if and when
they might occur. During the period they were laid
off, the workers' union struck the plant, at which
time the company sent each laid-off worker a
notice to report to work the following day. The
plant manager testified that all recalled workers
who reported for work would have been assigned
work within their job classifications. These claim-
ants, however, refused to report. The employer
challenged the claimants' continued qualification
for unemployment benefits under § 29(8).

The Board of Review determined that the claim-
ants were entitled to refuse to return to work on
the authority of § 29(7), stating:

> It would appear that the question of whether or
> not the claimants should be disqualified under the
> labor dispute provisions of Section 29(8)(a) of the
> Act is not properly involved in these
> matters . . . . [*Wells* at 1.]

The board noted that the employer admitted
that the vacancies to which the claimants were
recalled existed only because of the strike and for
that reason held, citing § 29(7), that "benefits can-
not be denied under the Act to these claimants for
refusing to accept work offered under the condi-
tions established by this record." *Wells* at 2.

Assuming the opinion for reversal is correct, and
the cause of the permanently replaced workers'
unemployment was their refusal to take vacant
jobs at the plant they struck, their situation is
directly analogous to the situations of the indefi-
nitely laid-off workers in *Top O'Michigan, Campos,*
and *Wells.* They were workers without jobs but
with seniority rights to existing vacancies which

they refused to exercise because of a labor dispute. They refused new work at Plymouth Stamping, work under a new contract with new terms and conditions. Their refusal to take the work, therefore, must be evaluated under § 29(7).

There are numerous reasons why the vacancies at Plymouth Stamping might not constitute "suitable work" under § 29(7). The work might be considered vacant "due directly to" a labor dispute under § 29(7)(a). Or, to take the jobs, the workers might have been forced to resign from their union, running afoul of § 29(7)(c).[22] Similarly, the terms and conditions of the work might have been "substantially less favorable" than those prevailing for similar work in the Plymouth area at the time under § 29(7)(b), particularly given the record evidence that the terms offered the replacements included wages and benefits worth only two-thirds of that available under the previous contract.

We cannot make these determinations on the record before us. However, I believe that, since the Court believes it is necessary to remand this case for a determination regarding the availability of work, it is also necessary for the MESC to determine whether any work that was available was also suitable. The mandatory language of § 29(7) requires it.

Even were I to agree that a remand was prudent today to make factual findings regarding events nearly a decade old, I do not believe a remand is necessary because I do not believe the issue regarding a permanently replaced worker's duty to apply for work with a former employer is properly before this Court. The employer raised a challenge to the claimants' eligibility for unemployment compensation under the labor dispute disqualifica-

[22] See n 7.

tion of § 29(8) and did not charge under §§ 29(1)(c)
and (e) that the workers refused suitable work. As
stated in parts I-III above, I believe the labor
dispute disqualification ends upon a striker's per-
manent replacement. While I agree with the Court
that a permanently replaced worker could again
be disqualified for refusing to apply for or accept
available suitable work, that disqualification would
occur under §§ 29(1)(c) and 29(1)(e) of the act, and
the employer did not challenge the workers' eligi-
bility under those sections. The employer has the
burden of proving disqualification, *Michigan Tool
Co v Employment Security Comm*, 346 Mich 673;
78 NW2d 571 (1956), and I do not believe the
employer has sustained that burden.

C

Apart from the Court's failure to deal with
§ 29(7), it errs in another way when it disqualifies
the workers because of their refusal to apply indi-
vidually for work at Plymouth Stamping. By con-
ditioning eligibility for compensation on the non-
existence of a vacancy that a worker could have
filled, the Court creates a duty on the part of
permanently replaced workers to become, them-
selves, permanent replacements. In other words,
the Court disqualifies these individual workers
because of their union's collective decision to de-
mand group reinstatement. In effect, the Court
disqualifies any workers who declined to accept
work because of their refusal to cease acting as a
union.

It is far from clear that the Legislature intended
to create a duty on behalf of the union to drop a
demand for group reinstatement as a precondition
for its member's receipt of unemployment benefits.
Given the basic premise that the reason for a

union's existence is to enable workers to act collectively, it is untenable to conclude that the union *could* decide to apply for work that initially would be granted only a minority of its membership, absent any guarantees that the majority would be hired in the near future. To create such a duty in the union is to force the union to abandon collective action, to cease being a union.

Furthermore, there are serious doubts that a union could have dropped its demand for group recall without violating federal labor law. In order for the union to have accepted the seven openings "offered" the union in March, or to have asked to fill available vacancies at any other time, the union would have gained a benefit for only a minority within the bargaining unit. Such an action would have opened the union to charges that it violated federal law by failing to fulfill its duty of fair representation. Cf. *O'Neill v Air Line Pilots Ass'n, Int'l,* 886 F2d 1438 (CA 5, 1989).

The opinion for reversal places great emphasis on the fact that the union, for a brief period, capitulated to the company's demand that the workers return only as vacancies became available before changing its position and demanding again that the workers be rehired as a group. There is nothing in the record, however, to indicate the reason for the union's change in position. One can only surmise that the union reaffirmed its demand that the workers be rehired as a group for one, or both, of two reasons. Either the union realized that it could not obey its mandate to bargain for the benefit of *all* the workers by agreeing to the reëmployment of only a minority of its members, or the issue was put to a vote among the strikers and a majority decided that it would not agree to a term that would benefit only a minority. In either situation, the hands of the union negotiator were

tied, and he was incapable of doing that which the majority would require of him.

V

Finally, I write separately to urge the Legislature to take action in this area.

The Legislature has plenary power to fix entitlements to unemployment compensation. The United States Supreme Court held that states are free to set entitlements to unemployment compensation, even in the context of a labor dispute, without intruding on the power of Congress to enact federal labor laws. *New York Telephone Co v New York Dep't of Labor, supra.* The Legislature is free to grant or deny unemployment compensation to striking workers who have been permanently replaced.

I urge the Legislature to make its intent in this area explicit because of the extreme importance this issue has for the working men and women of this state.

CONCLUSION

As of January, 1981, the substantial contributing cause of the workers' unemployment was the fact that their jobs ceased to exist. Because the workers no longer voluntarily caused their unemployment after they had been permanently replaced, they were eligible for unemployment compensation. To the extent the workers' refusal to apply for work at Plymouth Stamping after their replacement caused their unemployment, they cannot be disqualified absent a finding that they refused to apply for available work that was suitable under §§ 29(6) and 29(7) of the MESA. I would affirm the decisions of the MESC, the circuit court, and the Court of Appeals.

While the Court's order in this case does not instruct the MESC to determine the suitability of any work found to be available, I note that the order does not foreclose this possibility. Justice LEVIN's opinion, in which the opinion for reversal concurs, specifically allows parties on remand to "develop a factual record respecting other bases on which the claimants are, or are not, eligible for benefits." *Post,* p 46. Thus, if the workers can establish on remand that any vacancies at Plymouth Stamping were "due directly to a labor dispute," or offered wages or benefits "substantially less favorable to the individual than those prevailing for similar work in the locality," or that accepting the work would require resignation from their union, then they can argue to the MESC that "benefits shall not be denied" them under § 29(7).

BOYLE, J. I concur in Justice ARCHER's conclusion, stated in parts III(A) and (C) of his opinion for affirmance, that the labor dispute disqualification provision of the Michigan Employment Security Act, MCL 421.29(8); MSA 17.531(8), no longer applied to the claimants once they were informed that they had been permanently replaced. I would hold that permanent replacement severs the causal connection between the strike and the unemployment, and thereby terminates the labor dispute disqualification. I write separately to respond to specific criticism aimed at my opinion and to clarify my view with regard to other questions raised by the several opinions filed.

Both parties agree that the claimants *were* permanently replaced, and the referee, the circuit court, and the Court of Appeals all so held. All lower bodies and courts implicitly or expressly held that the employer failed to carry the burden of proof regarding disqualification, and no party to

this proceeding has argued at any level, including
before this Court, that these employees will not be
permanently replaced. Both parties and all amici
curiae have also structured the question in this
case in the simplest terms possible, asking only
whether such permanent replacement removed the
disqualification under § 29(8). Like Justice ARCHER,
I would answer that question in the affirmative.

The fundamental assumption of the labor dis-
pute disqualification provision is that there exists
a job from which the striking employee has volun-
tarily absented himself because of a labor dispute
and to which he will return at the end of that
dispute. When, however, the striking employee is
notified that his position has been filled—that he
has been permanently replaced by another em-
ployee—that assumption no longer obtains. In the
language of the statute, once the striker has been
permanently replaced, his unemployment ceases to
be "due to" the strike. At that juncture, the *only*
"substantial contributing cause," *Baker v General
Motors Corp,* 409 Mich 639, 660; 297 NW2d 387
(1980), of the striker's unemployment is his perma-
nent replacement.

The employer in this case makes much of its
"offer" during negotiations to allow the strikers to
return to work as openings became available.[1]
According to the employer, that offer, and its
subsequent refusal by the union, which demanded
the immediate return of all of the employees to
their former positions should an agreement be
reached, kept the labor dispute alive and required
the continued application of the disqualification
provision. I disagree. In my view, an employer

[1] The record is clear that the union's consistent position was always
that strikers would return to work only as a group. However, the
record is equally clear that no offer of employment was made to any
individual employee.

enjoys the protection of § 29(8) only so long as it does not act to alter the employment relation. Permanently replacing an employee disturbs the status quo of that relation and destroys both the policy considerations and the fundamental underlying assumption behind the disqualification. Section 29(8), therefore, ceased to control this case when the employer notified the strikers that they had been permanently replaced.

In my view, it is inappropriate given the parties' presentation of the issue before this Court, to address the question whether some other provision may bar the claimants' recovery. In particular, I do not believe that the suitability of the "offered" employment is before this Court. MCL 421.29(1)(d), (e); MSA 17.531(1)(d), (e). While the employer did argue that the union turned down offered work, it made that argument only in the context of § 29(8), as evidence that there was an ongoing labor dispute. At no time did the employer argue that its offer disqualified the claimants from receiving benefits under another section of MESA. The failure to make that argument is understandable, since it is debatable whether the employer proved such an offer during the proceedings below. Thus, I would leave to another day when the issues have been raised below and briefed and argued here the question whether § 29(8) is resurrected as a bar because of an employee's refusal of a specific offer of a job until all striking employees are rehired as a group (as well as other issues arguably apposite to that question).

Justice BRICKLEY contends that the "heart of the problem" in this case is the lower courts' failure to recognize the "legal distinction" between a discharge and a permanent replacement. *Post,* p 53. He attempts to distinguish cases from this and other jurisdictions finding that permanent replace-

ment removes the disqualification, such as *Knight-Morley Corp v Employment Security Comm*, 352 Mich 331; 89 NW2d 541 (1958), *Baugh v United Telephone Co*, 54 Ohio St 2d 419; 377 NE2d 766 (1978), and *Brannan Sand & Gravel v Industrial Claim Appeals Office of Colorado*, 762 P2d 771 (Colo App, 1988), on the ground that they are discharge or "replacement 'plus'" cases. *Post*, p 57. Yet, whether the employer intended to discharge or merely replace the striking employees is irrelevant to our resolution of this case. It is the fact of permanent replacement, not the particular intent of the employer, that destroys the underlying assumption behind the labor dispute disqualification and thereby prevents its application to the replaced striker.[2]

Justice BRICKLEY contends that we should not place too much emphasis on the term "permanent replacement." The act of permanent replacement does not, Justice BRICKLEY states (*post*, p 55, n 9), "inexorably signif[y] that no positions exist or will ever become available for displaced strikers." To so conclude ignores the "labor law meaning of permanent replacement which mandates preferential hiring rights . . . ." According to Justice BRICKLEY, a rule which recognizes that the fact of permanent replacement severs the causal connection between the unemployment and the labor dispute would work unimaginable results, such as ninety-nine out of one hundred striking workers, who had been permanently replaced but subsequently offered positions, receiving benefits so long as the one remaining worker was without such an offer.

---

[2] As a practical matter, if the claimants had shown that they had been discharged as opposed to permanently replaced, they would have established an unfair labor practice, and thus arguably would have been entitled to reinstatement to their old positions in any event. *NLRB v Mackay Radio & Telegraph Co*, 304 US 333; 58 S Ct 904; 82 L Ed 1381 (1938).

Aside from the fact that the employer never proved in this case which plaintiffs, if any, were offered reinstatement, it must be pointed out that it is the converse of Justice BRICKLEY's hypothetical case that is true under his formulation of the rule. To state the extrapolated proposition as Justice BRICKLEY would apparently conclude, ninety-nine out of one hundred workers would be ineligible for compensation because one had arguably declined employment. In this case, that means that nine of sixteen employees whose jobs were "gone" by way of permanent replacement are denied compensation even though their unemployment is caused by their employer's having permanently replaced them. Thus, Justice BRICKLEY would apparently require that if there is any job to which an employee could arguably return, the strike must be abandoned as a condition for the labor dispute disqualification to become inoperative.[3]

Unlike Justice BRICKLEY, I do not believe that the distinction between discharge and permanent replacement has been lost at any level in this dispute. Rather, it is the opinion for reversal that fails to recognize the most significant factual and legal distinction in this case: that which exists between the hiring of temporary replacements to fill the striking employees' positions during the course of the labor dispute and the hiring of

---

[3] With all due respect, Justice BRICKLEY's dismay may be precipitated by his imaginative reformulation of the issue on which we granted leave, which might be paraphrased thusly,

"Whether all striking employees who have been permanently replaced, some of whom refuse to return to work, one by one, as jobs are offered at sixty percent of their former pay and benefits are as a group to be denied compensation despite any record evidence of a specific job offer to a specific employee because the union's insistence on group reinstatement creates a new labor dispute which relates back to and resurrects the dispute preceding permanent replacement."

permanent replacements to fill positions that the strikers, in all probability, will never be asked to fill again themselves. It is the distinction between temporary and permanent replacement that the striking employee is likely to consider tangible and real, not the distinction between permanent replacement and discharge.

While Justice BRICKLEY complains that too much emphasis is placed in this opinion on the words "permanent replacement," the fact is that his opinion places *no* emphasis on the reality those words describe in most cases. He would, in effect, hold that an employer's decision to depart from the usual practice of hiring temporary replacements for the duration of the strike is of no consequence. I cannot agree that there is no practical difference, even given the "labor law meaning" of the terms, between temporary and permanent replacement, for purposes of receiving unemployment benefits.

Finally, I wish to make clear what may otherwise be obscured by the three seemingly divergent opinions in this case. Four justices agree clearly that any striker who is permanently replaced is thereby entitled to benefits from that time forward unless and until some succeeding event again renders the labor dispute a substantial contributing cause of the unemployment. A majority of this Court, in three separate opinions, answers the question upon which we granted leave in the negative.

Thus, I fully concur in all of Justice LEVIN's opinion[4] except the result of remand. If there is a paucity of record evidence, it should be outcome-

---

[4] I do not agree with Justice BRICKLEY's characterization of Justice LEVIN's holding, *post,* p 60. In my view, Justice LEVIN clearly holds that where a claimant subsequently refuses reëmployment unless all striking employees are reëmployed as a group, such refusal "may be" relevant to whether the labor dispute disqualification is reinstated.

determinative depending on who has the burden of proof. Here the employer failed to prove which of the sixteen employees it would have reinstated to any specific job.

Because I believe it is neither necessary nor prudent to remand for development of a record which would attempt reconstruction of events that occurred ten years ago, I would prefer to affirm the decision of the Court of Appeals. A majority of the Court having agreed to remand, I agree nonetheless with Justice ARCHER that all issues may be reopened including whether (after permanent replacement entitling a worker to unemployment compensation) a worker's refusal to return to work upon the offer of a specific job is a disqualifying condition exempted by § 29(7).

CAVANAGH, J., concurred with BOYLE, J.

LEVIN, J. The Court granted leave to appeal "[l]imited to the issue whether the employee-claimants, who were engaged in a strike against their employer, were disqualified for unemployment benefits pursuant to the labor dispute provisions of § 29(8) of the Employment Security Act, MCL 421.29(8); MSA 17.531(8), when they were permanently replaced during the course of the strike."[1]

We all agree that resolution of that issue depends on whether "a labor dispute in active progress"[2] was a "substantial contributing cause"[3] of the claimants' unemployment. We also all agree that when the claimants initially went on strike, a substantial contributing cause of their unemploy-

---

[1] *Plymouth Stamping v Lipshu,* 432 Mich 891 (1989).

[2] MCL 421.29(8); MSA 17.531(8).

[3] *Baker v General Motors Corp,* 409 Mich 639, 660; 297 NW2d 387 (1980). See also *Smith v Employment Security Comm,* 410 Mich 231, 257; 301 NW2d 285 (1981).

ment was a labor dispute in active progress, i.e., the strike.

I agree with the opinions for affirmance that when the employer exercised its right to hire permanent replacements, the strike was not at that moment a substantial contributing cause of the claimants' unemployment.[4] The claimants were eligible for benefits *from that time forward* until any succeeding events again rendered the labor dispute a substantial contributing cause of the claimants' unemployment.

The lead opinion for affirmance would hold that a claimant's refusal to accept an offer of employment at Plymouth Stamping, manifested by his representative's demand for group reinstatement, does not have any bearing on the claimant's eligibility for benefits under § 29(8).[5] I agree with the opinion for reversal that a claimant's refusal to accept an offer of employment at Plymouth Stamping may be relevant to the determination of whether the labor dispute was a substantial contributing cause of the claimant's unemployment.

The present record is not sufficient for a determination with respect to individual claimants[6] of

---

[4] Had the strike ended the moment after the employer conferred permanent status on the replacement employees, the claimants would still have been—and, absent some succeeding event, would continue to be—unemployed.

[5] The opinion observes that an individual claimant's acceptance of an offer of employment at Plymouth Stamping would have been inconsistent with the union's demand for group reinstatement and might have resulted in the imposition of union sanctions. On this basis, the opinion would hold that the unemployment of a claimant who refused to accept available work at Plymouth Stamping was "involuntary" unemployment, and hence not unemployment that renders a person ineligible for benefits. See *ante,* pp 19-20.

[6] Section 29(8) provides that "[a]n *individual* shall be disqualified for benefits for a week in which *the individual's total or partial unemployment* is due to a labor dispute in active progress . . . ." MCL 421.29(8); MSA 17.531(8) (emphasis added).

The legislative policy that unemployment compensation benefits are

whether the labor dispute again became, at some point after the employer's exercise of its right to hire permanent replacements, a substantial contributing cause of unemployment.

I do not regard the paucity of record evidence as an indication that claimant-specific fact finding is impossible or prohibitively difficult,[7] but see it rather as the result of the contentions of the parties who proceeded on the assumption that they should prevail without regard to such determinations.

The referee did not make any findings of fact respecting: 1) the number of discrete positions that became available after the employer hired permanent replacements,[8] 2) the date when each position became available, 3) which claimant was entitled to fill each position,[9] and 4) whether the employer notified the union of each vacancy.

I would remand the case to the Michigan Employment Security Commission for further factual development regarding the availability of work at Plymouth Stamping after the employer first conferred permanent status on the replacement em-

a matter of individual—not collective—right is also expressed in other statutory provisions. See, generally, MCL 421.30; MSA 17.532 (inalienability of benefits), and MCL 421.31; MSA 17.533 (invalidating any agreement by a person to waive or release his right to benefits).

[7] I disagree with the statement in the opinion for reversal that "the refusal of the strikers to return except as a group also foreclosed a determination in this case of which strikers would have been eligible for benefits due to the presence of replacement employees . . . ." *Post,* p 52.

[8] There was testimony from an interested witness that thirty-seven openings occurred before May 1982, the date of the evidentiary hearing.

There are sixteen claimants. Unless the bargaining unit experienced substantial growth during the strike, it is probable that many of the thirty-seven "openings" represent a second or subsequent attempt to fill the same position.

[9] This would depend in part on which claimants were qualified to fill a particular position and which claimant—if there was more than one qualified claimant—would be entitled to fill a particular position.

ployees.[10] The parties also should be allowed to develop a factual record respecting other bases on which the claimants are, or are not, eligible for benefits.

BRICKLEY, J. (*separate opinion*). This case presents us with the issue whether the Michigan Employment Security Act's labor dispute disqualification provisions preclude permanently replaced economic strikers from receiving unemployment benefits.[1] An MESC referee and the MESC Board of Review determined the claimant-appellee strikers eligible for benefits from the date the employer hired permanent replacements. The Wayne Circuit Court and the Court of Appeals affirmed the board's decision as supported by competent evidence and not contrary to law. We would reverse because the lower courts based their decisions on legally erroneous analyses of the facts presented. We would hold that where, as in the instant case, the facts presented indicate that economic strikers decline to accept a limited number of vacancies offered by an employer, and as a condition of ending the strike demand immediate reinstatement of all strikers, all such strikers remain dis-

---

[10] The employer has the burden of proof concerning the applicability of the labor dispute disqualification. See *Smith*, n 3 *supra*, pp 257-258, and *Michigan Tool Co v Employment Security Comm*, 346 Mich 673, 679-680; 78 NW2d 571 (1956).

[1] MCL 421.29(8); MSA 17.531(8) states in relevant part:

An individual shall be disqualified for benefits for a week in which the individual's total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by that labor dispute, in the establishment in which the individual is or was last employed, or to a labor dispute, other than a lockout, in active progress, or to shutdown or start-up operations caused by that labor dispute, in any other establishment within the United States which is functionally integrated with the establishment and is operated by the same employing unit.

qualified from receiving unemployment benefits
due to the continuance of a labor dispute in active
progress.

I

The claimant-appellees in this case, all produc-
tion employees of Plymouth Stamping, had a con-
tract with employer Plymouth Stamping due to
expire on September 1, 1980. The parties began
negotiations over wages and other terms of em-
ployment in August, 1980. A local branch of the
International Union, United Automobile, Aero-
space and Agricultural Implement Workers of
America represented the employees for collective
bargaining. Despite negotiations, the parties failed
to reach an agreement by the expiration date, and
the employees went on strike on September 9,
1980. Although the union and the employer con-
tinued to negotiate throughout the strike, the
parties could not reach an agreement.[2] The com-
pany continued production during the strike, ini-
tially by using management personnel, relatives,
and friends, subsequently by hiring replacements.[3]

During negotiations on January 15, 1981, the
employer's attorney announced that the company
considered the replacements hired during the
strike permanent employees. The company re-
affirmed its position regarding the permanent sta-

─────────────

[2] The union subsequently filed an action before the National Labor
Relations Board, charging the employer with violating its duty to
bargain in good faith. The board rejected this charge, finding that
"[t]he Respondent [employer] engaged in hard but lawful bargaining
and that any stiffening of its bargaining position during the course of
negotiations reflected its then current economic condition and its
ability to survive the Union's strike." *Plymouth Stamping Div, Eltec
Corp,* 286 NLRB 890, 894; 127 LRRM 1021 (1987).

[3] In December, 1980, the employer informed the replacements that
they would permanently retain their positions in the event of a
settlement with the strikers.

tus of the replacement employees during continuing negotiations on February 26, 1981. The employer also advised the union of seven openings the sixteen strikers could immediately fill if the union accepted the employer's latest contract offer.[4]

The company formalized this position in a written proposal submitted on March 12, 1981.[5] The union initially rejected the company's proposal on the retention of the permanent replacements. The union advocated the position that no strikers would return as long as any replacements worked for the company.

The union amended this position by a letter to the company on September 15, 1981. The union's letter expressed a willingness to return unconditionally to work pending continued negotiations. However, during negotiations on October 2, 1981, the union's representative repudiated the September 15 letter. The representative indicated that the strikers would not unconditionally return to work. Instead, the union's position remained that the strikers would only return as a group after the company fired or laid off all replacements.

The employee-claimants applied for unemploy-

---

[4] The employer also testified before the referee that up to thirty-seven openings occurred throughout the course of the strike. It is unclear from the present record whether these vacancies occurred because of an expanding workforce or due to high turnover.

Justice BOYLE states, "the record is equally clear that no offer of employment was made to any individual employee." *Ante,* p 38, n 1. Obviously in view of the union's position that individual strikers would not return, the employer communicated the existence of openings to the union rather than to individual employees.

[5] The employer's proposal read:

10. The Company shall have the right to retain replacements. Striking employees shall have preferential hiring rights to openings as they occur. Striking employees shall be offered employment in accordance with the recall provisions of the Agreement (Article VIII - Section 5).

ment benefits. The Michigan Employment Security
Commission initially denied them unemployment
benefits on the basis of MCL 421.29(8); MSA
17.531(8), and they appealed. An MESC referee
reversed this initial administrative decision after
an evidentiary hearing in May, 1982. The referee,
relying on *Knight-Morley Corp v Employment
Security Comm,* 352 Mich 331; 89 NW2d 541
(1958), and *Intertown Corp v Unemployment Com-
pensation Comm,* 328 Mich 363; 43 NW2d 915
(1950), held that the evidence indicated that the
strikers "were terminated at least as of January
15, 1981, when according to the claimants they
were so [informed] by . . . the negotiator for that
employer."

The MESC Board of Review affirmed the referee's
decision in a two-to-one decision mailed in Janu-
ary, 1985. Board member Hall stated that the
employer's hiring of permanent replacements com-
bined with its failure to present evidence that the
strikers remained on its employment rolls or that
the employer retained their insurance coverage
indicated that the employer no longer considered
the strikers its employees. Board member Hogan,
concurring, stated simply his "opinion that the
Referee's decision represents a proper application
of the law to the facts and should be affirmed."
Board member Carter, dissenting, disagreed with
the board's decision on three grounds.

First, Carter noted that under federal labor law,
permanent replacement of striking employees does
not equal discharge. An employer may lawfully
replace economic strikers and retain the replace-
ments when the strike ends. Second, Carter cited
an unpublished Court of Appeals opinion *Trombly
v St Francis Hosp,* decided September 20, 1983
(Docket No. 64505), for the proposition that notice
of permanent replacement in itself does not consti-

tute discharge of strikers. Third, Carter distinguished the cases relied on by the majority, *Intertown Corp v UCC* and *Knight-Morley Corp, supra.* In Carter's view a labor dispute constituted the substantial contributing cause of the strikers unemployment and "said labor dispute had not terminated at least through the date of the Referee's hearing in this matter."

The Wayne Circuit Court and the Court of Appeals affirmed the board's decision entitling the claimant-appellants to unemployment benefits. Also relying on *Knight-Morley Corp, supra,* the Court of Appeals held that "[a]lthough strikers should be disqualified from receiving benefits during a strike even if the employer hires replacements, the disqualification should end when and if the employer announces that the replacements will be kept permanently." 168 Mich App 21, 32; 424 NW2d 530 (1988). Plymouth Stamping appeals the award of benefits to the claimant-appellee strikers.

II

The Employment Security Act reflects a primary legislative purpose of protecting wage earners against the evils incident to involuntary unemployment. *Renown Stove Co v Unemployment Compensation Comm,* 328 Mich 436, 440; 44 NW2d 1 (1950). However, the labor dispute disqualification provisions of the Employment Security Act also enunciate an explicit legislative policy preference: denial of compensation for employees unemployed due to their direct participation in an active labor dispute. For better or worse, this Court may not superimpose our own policy preferences on a legislative scheme evincing a clear enactment of legislative intent.

The labor dispute disqualification provision explicitly precludes the strikers from receipt of unemployment benefits because a labor dispute continued in active progress even after the employer permanently replaced them. This Court has stated that "[a labor dispute] means no more than a controversy between employer and employees regarding hours, wages, conditions of employment or recognition of a bargaining representative." *General Motors Corp v Employment Security Comm*, 378 Mich 110, 117; 142 NW2d 686 (1966). In the instant case, the union initially offered to unconditionally return to work and therefore to end the labor dispute. However, the striker's subsequent demand to return only as a group rather than as vacancies occurred constituted a new demand, separate from earlier economic demands, which continued the labor dispute.[6] Had the union stuck to its original announced position of being willing to return to work, those strikers whose positions were filled by permanent replacements would undoubtedly have been entitled to unemployment compensation until such time that vacancies became available. However, the strikers' demand to return as a group constituted a "substantial contributing cause" of the strikers unemployment. *Baker v General Motors Corp*, 409 Mich 639; 297 NW2d 387 (1980). The strikers remained on strike over the issue of reinstatement. The strikers' demand for group reinstatement also precluded reëmployment of those strikers for whom vacancies existed.

---

[6] The NLRB accurately noted in this regard that "After 15 January 1981, the subject of strike replacements undoubtedly became the major issue separating the parties. By 10 March 1981, the parties' positions were firm: the Union stated there would be no agreement unless all the strikers were granted amnesty and returned to work and the [employer] demanded the right to retain the replacements while granting the strikers amnesty and preferential hiring rights." *Plymouth Stamping*, n 2 *supra*, p 896.

In our view, the refusal of the strikers to return except as a group also foreclosed a determination in this case of which strikers would have been eligible for benefits due to the presence of replacement employees, and also foreclosed the reëmployment of strikers that would have been rehired as future openings became available. The record indicates the strikers unequivocally pronounced themselves unavailable for reinstatement until the employer acceded to their demand for group reinstatement. Thus an active labor dispute remained as the immediate and substantial contributing cause of the striker's unemployment.

III

We agree with the lower courts' articulation of the appropriate standard of review in determining whether the Employment Security Act disqualifies the appellee strikers from unemployment benefits:

> This Court may reverse an MESC referee and the board of review only if their decision is contrary to law or not supported by competent, material, and substantial evidence on the whole record. [168 Mich App 24.]

However, we disagree with the legal conclusions of the MESC board and the courts below in concluding that MCL 421.29(8); MSA 17.531(8) did not disqualify the strikers from unemployment benefits. The MESC and the courts below failed to correctly distinguish cases which have equated the lawful act of permanent replacement to the unlawful act of termination or discharge from the case at bar.

The circuit court noted in affirming the award of benefits that

> [t]he referee's disinclination to accept the employ-

er's argument that there is a meaningful distinction in this case between being permanently replaced and being discharged is supported by the referee's findings of fact. No matter what the employer chooses to call them, the referee found that the employees were discharged.

Similarly, the Court of Appeals failed to distinguish between permanent replacement and termination or discharge, as illustrated by its holding that

[a]lthough a close case, we believe that the referee's decision was correct and not contrary to law. Because there are cases which hold that permanent replacement is equivalent to termination of employee status and that the labor dispute disqualification ends when the claimant is permanently replaced, the referee's decision can not be said to be contrary to law.

. . . Since there is no Michigan case having precedential value which says that a situation like the instant case should be distinguished from *Knight-Morley,* we believe that *Knight-Morley* should be followed. [168 Mich App 32.]

These statements illustrate the heart of the problem in this case: the failure to recognize any legal distinction between the termination or permanent discharge of strikers during a strike as compared with the situation of strikers whose positions have been permanently filled but who retain first call on immediately available and future vacancies but nonetheless continue to strike.[7]

---

[7] Justice BOYLE states, "All lower bodies and courts . . . held that the employer failed to carry the burden of proof regarding disqualification . . . ." *Ante,* p 37. However, under the erroneous legal standard of review employed by the lower tribunals and validated by the opinions for affirmance, an employer apparently could not meet the burden of persuasion even if, as in the instant case, significant numbers of vacancies became available for "permanently" replaced positions.

The Court of Appeals erred in relying on *Knight-Morley Corp, supra,* to uphold the MESC's award of benefits to the claimant employees. In *Knight-Morley,* we held that permanently replaced economic strikers were entitled to unemployment compensation where the employer informed the strikers that they must either return to work or face termination. The employer subsequently announced that the strikers were terminated and removed their names from payroll records, canceled the strikers' life and medical insurance policies, and published a letter in a newspaper "which stated [that] with respect to those on strike that 'they are no longer employees of this company.' " 352 Mich 333. In contrast, the strikers did not allege that the employer in the instant case informed them of termination. To the contrary, the employer testified that it notified the union of the existence of vacancies as such occurred. Unlike the strikers in *Knight-Morley,* the strikers in the instant case did not present evidence indicating an intent by the employer to discharge or terminate them.

In *Knight-Morley,* the employer made it so obviously clear that the remaining strikers would no longer have an opportunity to work for the company that the underlying labor dispute became irrelevant to the strikers' unemployment. In the present case, however, the record indicates that at least seven of the fourteen strikers had jobs waiting for them, and the others had reasonable prospects of future reëmployment. This illustrated that the labor dispute continued "to be a substantial contributing cause of . . . unemployment." *Baker v General Motors, supra,* 660.[8] In *Knight-Morley,*

[8] A situation where an employer permanently replaced strikers with no immediate vacancies available and dim prospects for future vacancies would present a closer case in determining whether the

the termination of the strike would not have returned any of the remaining strikers to their jobs. In the case at bar, the end of the strike would have returned nearly half of the claimants to their jobs and would have removed the "due to a labor dispute" disqualification for those strikers whose jobs were not available because of the presence of permanent replacements.[9]

---

labor dispute was the "substantial contributing cause" of the striker's unemployment. We do not decide such a case today.

[9] Justice BOYLE states, "Yet, whether the employer intended to discharge or merely replace the striking employees is irrelevant to our resolution of this case." By resting her decision only on the words "permanent replacement" and ignoring the reality of what occurred here, Justice BOYLE disregards the fact that some employees who have refused employment in order to continue the strike until all permanent replacements are removed will now be eligible for unemployment benefits for the period they refused to work because of the labor dispute.

The simple fact is that under the rule laid down by the opinions for affirmance, if an employer offered positions to ninety-nine out of one hundred striking employees who had been permanently replaced and they all declined to take those positions until the one-hundredth striking employee was also offered an immediate position, all one hundred strikers would be eligible for unemployment benefits for the remaining period of the strike. To reconcile this with a statute that clearly states, "An individual shall be disqualified for benefits for a week in which the individual's total or partial unemployment is due to a labor dispute in active progress" defies the imagination.

Justice BOYLE concedes the accuracy of the above hypothetical case, but responds that under the analysis of our opinion the converse would apply: that "ninety-nine out of one hundred workers would be ineligible for compensation because one had arguably declined employment." *Ante,* p 41. This analysis of our opinion ignores its explicit assertion that "we would not establish a rule that permanently replaced economic strikers can in no case receive unemployment compensation." Our analysis simply requires a case-by-case determination of whether a "labor dispute in active progress continued 'to be a substantial contributing cause of . . . unemployment.' "

The opinions for affirmance also mistakenly conclude that the act of permanent replacement inexorably signifies that no positions exist or will ever become available for displaced strikers. This conclusion contravenes the labor law meaning of permanent replacement which mandates preferential hiring rights for permanently replaced workers, and which, accordingly, neither empirically nor analytically precludes a determination on remand of which strikers could or could not have been returned to work had the strike ended, and whose unemployment no longer obtained "due to a labor dispute." This

The case of *Intertown Co v Unemployment Compensation Comm, supra,* similarly does not dispose of the instant case. The employer in *Intertown* replaced striking employees and sent a letter that the strikers "interpreted as a termination of their employment." 328 Mich 365. In contrast, the employer in the instant case did not evidence an intent to terminate the strikers, nor did the strikers indicate a subjective sense of termination.[10] The record in this case indicates quite the contrary. The strikers continued to picket the employer even after the hiring of replacements. The employer testified it considered those who replaced the strikers to be employees with preferential rights to reinstatement.

The instant case is also factually distinguishable from cases in other jurisdictions which have held that an employer's permanent replacement of strikers removes the bar to unemployment com-

analysis leaves room for a factually responsive construction of the labor dispute disqualification provisions, in contrast to the opinions for affirmance, which would inflexibly fix permanent replacement as the decisive factor entitling strikers to receipt of unemployment compensation.

Finally, Justice Boyle states that our opinion "would apparently require that if there is any job to which an employee could arguably return, the strike must be abandoned as a condition for the labor dispute disqualification to become inoperative." *Ante,* p 41. More accurately, our opinion holds that the labor dispute disqualification does not become operable, where all permanently replaced strikers refuse to return to work even though a significant number of vacancies existed for some. Our opinion recognizes that as in *Knight-Morley* situations may exist where a striker's unemployment is not substantially "due to a labor dispute" despite a continuing strike.

[10] The union's attorney conceded that the employer was willing to give the strikers preferential hiring rights:

So, in this case, the company when they [sic] replaced the workers, they destroyed the employer-employee relationship *and they're taking the position consistently throughout that they had been replaced, and only if and when a vacancy would occur would they give them preferential hiring rights.* [Emphasis supplied.]

pensation under labor dispute disqualification pro-
visions analogous to MCL 421.29(8); MSA 17.531(8).
These cases might more properly be characterized
as replacement "plus" cases—i.e., the cases com-
prise fact patterns manifesting intent by the em-
ployer not merely to permanently replace but to
terminate the employment relationship. In *Baugh
v United Telephone Co*, 54 Ohio St 2d 419; 377
NE2d 766 (1978), the Ohio Supreme Court held
that the statutory labor dispute disqualification
provision[11] did not disentitle permanently replaced
strikers to unemployment compensation. However,
unlike the instant case, the employer, in *Baugh*
sent a letter informing the strikers that if they
failed to report by a certain date "the immediate
hiring of permanent replacements would com-
mence and, if at the end of the strike a replace-
ment occupied the employee's former job, the em-
ployee had no job." 54 Ohio St 2d 424-425. The
employer then sent the strikers a second letter
"informing them that their positions had been
filled." *Id.* at 425. From these facts the *Baugh*
court concluded that the employer's action consti-
tuted the proximate cause of the strikers unem-
ployment.

Similarly, in *Brannan Sand & Gravel v Indus-
trial Claim Appeals Office of Colorado*, 762 P2d

---

[11] Ohio Rev Code Ann, § 4141.29(D)(1)(a), Ohio's labor dispute dis-
qualification provision provides in relevant part:

(D) Notwithstanding division (A) of this section, no individual
may serve a waiting period or be paid benefits under the
following conditions:
(1) For any week with respect to which the administrator
finds that:
(a) His unemployment was due to a labor dispute other than
a lockout at any factory, establishment, or other premises
located in this or any other state and owned or operated by the
employer by which he is or was last employed; and for so long
as his unemployment is due to such labor dispute.

771 (Colo App, 1988), a Colorado appellate court set aside the employment agency's decision that permanently replaced strikers could not receive unemployment compensation under the statutory labor dispute disqualification provision.[12] The court held that "whether an employer has permanently replaced an employee, and thereby severed the labor dispute as the cause of unemployment, is a question of fact to be determined by the employer's actions in every case." 762 P2d 774. Significantly, and in contrast to the instant case, the employer in *Brannan Sand & Gravel* sent a letter advising the strikers that " 'if such a replacement is hired before you make an unconditional offer to return to work, you will not have a job with us at that time.' " 762 P2d 772.

The California Supreme Court in *Ruberoid Co v California Unemployment Ins Appeals Bd,* .59 Cal 2d 73; 27 Cal Rptr 878; 378 P2d 102 (1963), similarly held that the statutory labor disqualification provision[13] did not preclude economic strikers from receiving unemployment compensation. In contrast

---

[12] Colorado's labor dispute disqualification provision Colo Rev Stat, § 8-73-109, provides in relevant part:

(1) An individual is ineligible for unemployment compensation benefits for any week with respect to which the division finds that his total or partial unemployment is due to a strike or labor dispute in the factory, establishment, or other premises in which he was employed and thereafter for such reasonable period of time, if any, as may be necessary for such factory, establishment, or other premises to resume normal operations.

[13] Section 1262 of California's Unemployment Insurance Code provides:

An individual is not eligible for unemployment compensation benefits, and no such benefit shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed.

to the instant case, the employer in *Ruberoid* hired replacements and then "mailed to all employees still on strike notice that they had been permanently replaced and enclosed a check for their pro rata vacation pay to the date of the strike." 59 Cal 2d 75. The *Ruberoid* court interpreted these actions as evidence that the employer "liquidated the strikers' jobs, which were the cause and occasion of the trade dispute." 59 Cal 2d 82.

The above cases all illustrate that courts which have refused to apply labor dispute disqualification provisions in the permanent replacement context have also found employer intent to terminate or sever the employment relationship with the strikers. However, none of the above cases indicate that, as in the case at bar, strikers perpetuated a labor dispute by substituting a demand for group reinstatement in place of their original economic demands over wages and other terms of employment.

Significantly, a California appellate court in *Windigo Mills v California Unemployment Ins Appeals Bd,* 92 Cal App 3d 586; 155 Cal Rptr 63 (1979), declined to apply the *Ruberoid* decision to a factual situation where numerous positions remained open after strikers had been replaced. The court noted that "there was no evidence suggesting that any employee who wanted to work had been refused a job. Moreover, even if there were insufficient openings for *all* the strikers, this would not compel the trial court to find all of the claimants eligible." 92 Cal App 3d 600 (emphasis in original). This reasoning applies in the case before us. The fact that some, but not all, of the strikers had been replaced should not automatically entitle all the strikers to unemployment benefits as long as they continue the strike.

IV

In reversing the decision of the Court of Appeals, we would not establish a rule that permanently replaced economic strikers can in no case receive unemployment compensation. The determination of whether the labor dispute qualifications of MCL 421.29(8); MSA 17.531(8) apply should proceed case by case, on the basis of a determination of whether the labor dispute in active progress continued "to be a substantial contributing cause of . . . unemployment." In the instant case, the Court of Appeals incorrectly applied the legal analysis employed in *Knight-Morley* in disregard of the plain language of MCL 421.29(8); MSA 17.531(8), which denies benefits to employees directly participating in a labor dispute in active progress.

Even though it is our view that the bargaining position of the strikers to decline any job vacancy unless and until all strikers could return should result in their disqualification, we nonetheless join Justice LEVIN in ordering a remand to the MESC to determine: "1) the number of discrete positions that became available after the employer hired permanent replacements, 2) the date when each position became available, 3) which claimant was entitled to fill each position, and 4) whether the employer notified the union of each vacancy." *Ante,* p 45.

We read Justice LEVIN's opinion as holding that, to the extent it can be determined on remand, any striker for whom a position became available during the strike is ineligible for benefits from the time each position became available.

Our opinion encompasses such a disqualification and we therefore concur with the result of Justice LEVIN's opinion.

RILEY, C.J., and GRIFFIN, J., concurred with BRICKLEY, J.